**In the Matter of Robert W. LYNCH and Susan M. Lynch, Debtors.**

**Bankruptcy No. MM13–81–00580.**

United States Bankruptcy Court, W. D. Wisconsin.

July 14, 1981.

Roy L. Prange, Ross & Stevens, S. C., Madison, WI, for First Wisconsin National Bank of Madison.

J. Thomas Haley, Madison, WI, for debtors.

Stephen C. Beilke, Kuemmel & Beilke, S. C., Madison, WI, for Thorp Finance Corporation.

### OPINION AND ORDER

ROBERT D. MARTIN, Bankruptcy Judge.

Two secured creditors, First Wisconsin National Bank of Madison and Thorp Finance, have objected to the confirmation of the debtors' chapter 13 plan and have requested relief from the § 362 stay. Prior to commencement of this case, First Wisconsin received a judgment in the amount of $13,-379.29 which also foreclosed the Bank's first and second mortgages on the debtors' homestead. Thorp received a judgment in the amount of $23,201.86 foreclosing its third mortgage on the debtors' homestead. The homestead was sold by the Dane County Sheriff to the highest of several unrelated bidders for $47,600.00 on March 24, 1981. On April 3, 1981, the date set for confirmation of the sale, the debtors filed their chap-

ter 13 petition. No hearing on confirmation of the sheriff's sale has been held.

The creditors' right to relief from stay is governed by 11 U.S.C. § 362(d) which states:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
>
> (2) with respect to a stay of an act against property, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

The creditors argue that because the property was sold prior to the debtors filing a petition in bankruptcy, the debtors have no interest or equity in the property. This position is supported by *In Re Butchman*, 4 B.R. 379, 380, 6 B.C.D. 403, 2 C.B.C.2d 174, Bankr.L.Rep. (CCH) ¶ 67,454 (Bkrtcy.S.D.N.Y.1980). In *Butchman*, the debtors' home was sold pursuant to a foreclosure judgment several hours prior to the filing of the debtors' chapter 13 bankruptcy petition. Judge Schwartzberg found that because "the foreclosure sale effectively cut off the debtors' legal title or equity of redemption in the mortgaged premises," the debtors were not entitled to cure the default as part of their chapter 13 plan. This holding was premised on the finding that "[i]t is settled law in New York that a valid judgment and sale in a mortgage foreclosure action entitle the purchaser at the sale to receive a deed to the premises upon compliance with the terms of the sale and that the mortgagor has no right to redeem the premises after the sale but before the purchaser has received a deed." *Butchman* at page 380. Although New York Statute R.P.A.P.L. § 1355 requires confirmation of a foreclosure sale, the right to redeem property in New York is limited to "any time before an actual sale under a judgment of foreclosure." *Belsid Holding Corp. v. Dahm*, 207 N.Y.S.2d 91, 12 A.D.2d 499 (1960).

A similar finding was made in *In Re Sparkman*, 9 B.R. 359, 3 C.B.C.2d 856 (Bkrtcy.E.D.Pa.1981). In *Sparkman*, the mortgagee sought relief from the stay when the debtor filed a chapter 13 petition after the mortgaged property was sold at a sheriff's sale. Judge Goldhaber stated:

> We conclude that the mortgagee and the VA are entitled to the relief sought because the debtor lacks any interest in the foreclosed property since it was sold at sheriff's sale and all acts necessary under Pennsylvania law to divest the debtor of his interest in the property were taken prior to the filing of the debtor's petition under chapter 13 of the Code.
>
> . . . .
>
> Under Pennsylvania law, the debtor lost all title and interest in the property in question when the mortgagee's attorney bid it in at the sheriff's sale, executed the required documents, and the acknowledged deed was delivered by the prothonotary to the sheriff. *See* Pa.Stat.Ann. tit. 12, § 2537 (Purdon). Consequently, the debtor had no interest whatsoever in that property when he subsequently filed his petition under chapter 13 of the Code. Therefore the debtor can have no equity in that property within the meaning of that term in § 362(d)(2), and the mortgagee is entitled thereunder to relief from the stay. *Sparkman* at pages 361 and 363.

Both *Butchman* and *Sparkman* represent unexceptionable reasoning and make clear that when state law terminates a debtor's interest in mortgaged property, the Bankruptcy Court cannot perforce rejuvenate that interest as a part of a Chapter 13 plan. To consider the present case, the Wisconsin law must, therefore, be reviewed to determine the nature of the debtors' interest in the property at the time of filing. One case seems to be directly in point.

> [A] foreclosure is not completed until the sale on foreclosure is confirmed. *Allen v. Elderkin*, 62 Wis. 627, 22 N.W. 842; *Welp v. Gunther*, 48 Wis. 543, 4 N.W. 647 . . . . There can be no doubt but that the right to redeem persists at least until confirma-

tion of sale, unless that right is cut off by statute. . . . It is clear that the title does not pass until confirmation so as to vest the purchaser with the right of possession. And it is equally clear that the right of redemption is not barred until confirmation of the sale. *Gerhardt v. Ellis*, 134 Wis. 191, 195, 196 [114 N.W. 495] (1908).

Thus it appears that under Wisconsin law mortgagors retain an equitable interest, i. e., the right to redeem, until a foreclosure sale is confirmed pursuant to Wis.Stats. § 846.165. A foreclosure sale does not preclude the debtors having an equity interest in the property, so long as that sale has not been confirmed. First Wisconsin and Thorp cannot rely on the occurrence of the sale to carry their burden to demonstrate that the Lynches lack equity in the property.

A review of the evidence of the value of the property set against the liens, mortgages and security interests claimed in the property gives no further aid to the creditors in meeting their burden on the debtors' equity. The creditors' appraiser valued the property at $62,500.00. The various mortgages, taxes and judgment liens, costs and charges against the property total less than $61,000.00. It is apparent, therefore, that the property could be redeemed and represent an asset with equity for the debtors. Having failed to meet the burden assigned by 11 U.S.C. § 362(g), the creditors are not entitled to relief from the stay.

First Wisconsin and Thorp contend that they are not adequately protected. First Wisconsin is owed $15,729.92 on its mortgages as of May 28, 1981. Thorp is owed $25,241.90 as of May 28, 1981. There are 1979 and 1980 real estate taxes presently owing of $2,997.04 which comprise the only lien prior to the positions of First Wisconsin and Thorp. There was no evidence that the position of either creditor will deteriorate from the date the case was filed until the conclusion of the plan. Regular monthly payments to the creditors as provided in the plan have not been shown to be inadequate to maintain the ratio of secured debt to the value of the property which existed at the time the plan was filed. In view of the debtors' equity in the property, I am satisfied that the protection offered these creditors by the plan is adequate at the present time.

First Wisconsin and Thorp have also objected to the confirmation of the debtors' plan on several grounds. They contend that once the mortgage has been accelerated and reduced to judgment, a chapter 13 plan cannot cure a default by paying the arrearages plus regular monthly installments, but must pay the entire amount of the judgment. The Lynches are not proposing to pay only the arrearages plus regular monthly installments. Their plan proposes to pay the entire amount owed under the creditors' foreclosure judgment within the plans' three-year term. The cure the debtors' plan proposes is the one the creditors are arguing is required; payment under the plan of the entire amount of the judgment.

The creditors' next objection is that the plan does not propose a cure of the mortgage's defaults within a reasonable time as required by 11 U.S.C. § 1322(b)(5). The debtors' plan proposes to pay all secured and unsecured creditors 100 percent over the three-year period of the plan. The homestead is listed for sale with a real estate broker and the proceeds of the sale are proposed to supplement the debtors' income in the repayment of their debts. The arrearage will be paid within the 36 months for which the plan is scheduled unless paid earlier from proceeds of the house sale. Whether such a time is reasonable has been considered by other courts.

The question of what is a "reasonable time" to cure a default under Section 1322(b)(5) is not addressed by the Code. *See* 11 U.S.C. § 1322(b)(5). Nor does the Code's legislative history provide any guidance on this question, *see* H.R.Rep. No.95–595, 95th Cong., 1st Sess. 429 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 141 (1978), and the commentators are also unhelpful. *See* 5 *Collier on Bankruptcy* ¶ 1322.01[3][E] (15th ed.); 5 Bkr.L.Ed. ¶ 46.11. This leaves the determination of what will be a "reasonable

time" under Section 1322(b)(5) committed to the discretion of the Court.

In the exercise of this discretion, it is clear that what will be a "reasonable time" under Section 1322(b)(5) is a question to be decided upon the facts and equities present in each case. (Citations omitted.) It has also been found, however, that a "reasonable time" under Section 1322(b)(5) is not synonymous with the three year period set forth in Section 1322(c). *See In re Coleman, supra,* 2 B.R. [348] at 350, 5 B.C.D. at 1301.

Under this case by case approach, certain equitable factors must be considered in evaluating the reasonableness of a proposal under Section 1322(b)(5). First of all, the debtors' payment record must be considered. In this regard, a claimant who has not received any payments on his debt is in a much better position to question the soundness of a proposal to cure, than one who has received partial payment. Complete disregard for the contractual expectations of a creditor, on the one hand, evidences a lack of good faith on the debtor's part. It may make a proposal to cure unacceptable, given the fact that the ability to cure under Section 1322(b)(5) is already a unique right allowing modification of a secured claim on the debtor's principal residence. *Compare* 11 U.S.C. § 1322(b)(5) with 11 U.S.C. § 1322(b)(2). *See also* 5 Bkr.L.Ed. § 46.-11. Thus, it should not be used to shield an outright abuse of contractual expectations. On the other hand, many debtors may have made a *bona fide* attempt at repayment and have not flagrantly disregarded their obligations....

Secondly, the length of the repayment period on the actual obligation should be considered. A proposal to cure covering a period of time shorter than three years cannot be considered a significant deviation from the parties bargain when it is contrasted with an original obligation having a lengthy repayment term. *But see In Re Coleman, supra,* 2 B.R. at 349–50. On the other hand, a short term debt envisions prompt payment in full, and a proposal to cure may well be termed un-

reasonable if it drastically alters this expectation....

Thirdly, the reason for the arrearage must be considered. If an obligation has simply been ignored, or the debtors have merely chosen to divert available funds for other expenditures, their arrearage must be viewed differently than one which arose for reasons which are beyond the debtors [sic] control.

. . .

Fourthly, the nature of the property held as security for the debt, if any, must be taken into account. For example, the Court would view a proposal to cure involving realty purchased solely as a speculative investment, differently than an attempt to cure a default on a debtor's principal residence. There is clearly a pressing need to salvage the debtor's own home, and although the interests involved may not be insignificant, there is surely a less grievous loss at stake when dealing with an investment property which the debtor does not occupy....

And finally, inquiry should be made into whether the debtors are putting forth their best effort to cure their default. This will involve a comparison of the amount being paid to cure the default with the total monthly payments made under the plan, and the other obligations being treated by the plan. *In Re King,* 3 C.B.C.2d 109, 111, 112, 6 B.C.D. 1270, 7 B.R. 110, Bankr.L.Rep. (CCH) ¶ 67,722 ([Bkrtcy.]S.D.Cal.1980).

The first factor, payment record, was not directly addressed at trial, but it appears that the debtors' have made a portion of their payments to both creditors. The first mortgage with First Wisconsin for $16,-500.00 was entered into July 11, 1967, and due July 11, 1992. A second mortgage with First Wisconsin for $11,000.00 was entered into September 30, 1977, and due October 6, 1982. First Wisconsin filed a proof of claim for $15,603.97 plus interest, an amount considerably less than the $27,500.00 principal amount of the original debts. There is no evidence that the debtors' payment record on Thorp's mortgage, entered into Septem-

ber 28, 1978, and due September 28, 1988, was unsatisfactory prior to the default resulting in the foreclosure judgment. The terms of the mortgages show the second factor, length of the repayment period on the original obligations. All three debts were for long terms, the shortest one having a ten-year repayment period. None of the mortgages were due by their terms prior to the time they will be paid in full under the terms of the plan. The debtors' proposal to cure in a maximum period of three years is not a significant variation from the parties' bargain. Third, the mortgage arrearages occurred because Robert Lynch had no employment income. This situation has been changed as he began work as a new employee April 1, 1981, receiving both a salary and a percentage of the profits. Fourth, the property securing the debt is the debtors' homestead. The final inquiry, best effort to cure the default in this case, cannot be measured by comparing the amount paid to cure the default with the total monthly payments made under the plan as was done in *King*. The debtors' monthly income is $1,977.00. Their budget shows expenses of $985.00 per month. The debtors' amended plan states that $650.00 per month is to be paid into the plan. Both creditors presented evidence to show that the Lynches' income projections were optimistic. At the very least, because income will depend partially on future profits from athletic promotions, future income may well be irregular. In light of the nature of the income and the plan's proposal to pay the objecting creditors in full, the excess in budgeted income over expenses is not convincing evidence that the debtors are not making their best effort to cure the defaults.

■ The creditors' final objection to the plan is that it is not feasible and therefore fails to comply with § 1325(a)(6). They argue that because the debtors failed to stay current on their mortgage payments in the past, it would be unrealistic to expect the debtors to maintain their mortgage payments under the plan. The testimony at trial shows an increase in the debtors' income and low, but not unrealistic, budgeted expenses. Additionally, the debtors have been making the payments required under the proposed plan. The debtors' failure to stay current on their mortgage payments prior to the filing of their Chapter 13 petition is not determinative of the feasibility of the plan. The Lynches' plan appears feasible.

It having been determined that:

1. the plan has been proposed in good faith and not by any means forbidden by law;

2. the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtors was liquidated under chapter 7 of Title 11, United States Code, on such date;

3. with respect to each allowed secured claim provided for by the plan,

a. the holder of such claim has accepted the plan;

b. the plan provides that the holder of such claim retains the liens securing such claim; and the value, as of the effective date of the plan of property to be distributed under the plan on account of such claim is not less than the allowed amount of said claim; or

c. the debtors surrender the property securing claims to such holder; and

4. the debtors will be able to make all payments under the plan and to comply with the plan;

IT IS ORDERED that the debtors' plan is confirmed.