**In re John J. NEWTON and Debra L. Newton, Debtors.**

**In re Teresa Susan JOHNSON, Debtor.**

**Bankruptcy Nos. 3–93–3016, 3–93–3300.**

United States Bankruptcy Court, D. Minnesota, Third Division.

Nov. 30, 1993.

209

Thomas G. Lauer, Burnsville, MN, for debtors John and Debra Newton.

Richard G. Nadler, St. Paul, MN, for debtor Teresa Susan Johnson.

James A. Geske, O'Neill, Burke, O'Neill, Leonard & O'Brien, St. Paul, MN, for Investors Sav. Bank and Inland Mortg. Corp.

Stephen J. Creasey, Minneapolis, MN, for Chapter 13 Trustee.

## ORDER DENYING CONFIRMATION OF PLANS OF DEBT ADJUSTMENT

GREGORY F. KISHEL, Bankruptcy Judge.

These Chapter 13 cases are before the Court for the proceedings on confirmation of the plans of debt adjustment proposed by the respective debtors. In both cases, a creditor holding a claim secured by a mortgage against the homestead of the debtor(s) has objected to confirmation. The objections were argued at the scheduled confirmation hearings, the one in BKY 3–93–3106 having been convened on August 26, 1993, and the one in BKY 3–93–3300 on September 24, 1993. In both cases, the objector appeared by James A. Geske, and the Chapter 13 Trustee appeared by Stephen J. Creasey. Debtors John J. Newton and Debra L. Newton appeared by Thomas G. Lauer. Debtor Teresa Susan Johnson appeared by Richard G. Nadler. Upon the record made for both cases, the Court makes the following consolidated memorandum order.

### I. PARTIES AND ISSUES

The Debtors commenced their cases by filing voluntary petitions for debt adjustment under Chapter 13, the Newtons on June 18, 1993, and Ms. Johnson on July 7, 1993. In both cases, the largest scheduled secured claim was held by a mortgagee holding security in the homestead of the debtor(s). In the Newtons' case that creditor was Investors Savings Bank, F.S.B. ("Investors"); in Ms. Johnson's case it was Inland Mortgage Corporation ("Inland"). As of the commencement of both cases, the payments owing to the mortgagees were seriously delinquent; the Newtons were in default on payments due for the months of January through June, 1993, in a total of $6,143.60

plus late charges, and Ms. Johnson was in default on payments due for November, 1992 through July, 1993, in a total of $5,181.00 plus late charges. Via their plans, the debtors in both cases proposed to have the standing trustee "cure defaults within a reasonable time" from funds accumulated from their periodic payments to the Chapter 13 estate, on a basis that gave those payments high priority in terms of the timing of their distribution.[1]

As framed by the mortgagee's objections to confirmation, the issue is the same in both cases: does the proposal of the debtor(s) "provide for the curing of [the] default within a reasonable time," as required by 11 U.S.C. § 1322(b)(5)[2] and the terms of the plan?

## II.  LEGAL STANDARD TO BE APPLIED

In arguing that neither plan meets the requirement of § 1322(b)(5), the objectors cite an early decision by one of the former judges of this Court: *First Fed'l Savings & Loan Assoc. of Mpls. v. Whitebread,* 18 B.R. 192 (Bankr.D.Minn.1982) (Owens, J.). In *Whitebread,* Judge Owens cited and relied on

1.  The plans in both cases were on the standard local form promulgated by this Court some years ago. The verbiage of the plan allows for some adjustment in the timing and amortization of various distributions that are to be afforded high priority in time. That adjustment is almost always made on an informal basis, through in-person negotiation at the meeting of creditors, and its final terms are memorialized only on the trustee's minute sheet for the meeting. As the standing trustee currently administers estates, the cure of pre-petition defaults on secured obligations is generally given second-highest priority, just below the payment of attorney fees owing to debtors' counsel.

2.  Section 1322(b) establishes the parameters for the content of a plan of individual debt adjustment under Chapter 13. The cited subsection provides that such a plan may,

> notwithstanding [11 U.S.C. § 1322(b)(2)], provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due ...

In turn, § 1322(b)(2) provides that a Chapter 13 plan may

a previous unpublished decision of his, to the effect that

> More than 12 months is ordinarily not a reasonable time to cure a default in pre-petition homestead mortgage payments under 11 U.S.C. § 1322(b)(5) ...

18 B.R. at 193[3] (emphasis added, and citation omitted). The financial circumstances of the debtors differ between the cases, as does their legal argument in response to the mortgagees' reliance on *Whitebread.*

### A.  Whether a Guideline for the Duration of a Cure Period Should Be Applied.

Taking exception to the frequent reliance on *Whitebread* by the judges of this Court, Ms. Johnson's counsel argues that the decision has been "superseded" by other courts' later, more extended examinations of § 1322(b)(5), and that it unreasonably limits the options of debtors under Chapter 13. He urges the adoption of a looser "facts and circumstances" standard for determining the reasonableness of the time over which a debtor proposes to cure a pre-petition default in mortgage payments.

To be sure, since 1982 a number of courts have treated this issue by adopting a stan-

> modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims ...

No one disputes that the last payments on both mortgage-secured debts in question here will come due long after the end of the terms of the debtors' plans.

3.  Since the *Whitebread* decision was the disposition of a mortgagee's post-confirmation request for relief from stay, and since the written memorandum is rather terse, it is not immediately clear why this observation was made. As nearly as can be gathered from the second paragraph of the decision, under the terms of their confirmed plan, the debtors—and not the trustee—were to make payments in cure of their pre-petition default, but had not specified a schedule. The decision does recite how the amount in default accrued after the commencement of the case. The content of that recitation suggests that the debtors in *Whitebread* never got around to curing the pre-petition default by any extra payments, and fell further behind on post-petition payments as they matured. The mortgagee apparently was relying on both of these defaults as the basis for its request for relief from stay.

dard that permitted such cures over periods of time longer than 12 months. *See, e.g., Appeal of Capps,* 836 F.2d 773 (3d Cir.1987) (5–year cure allowed); *Grubbs v. Houston First American Savings Assoc.,* 730 F.2d 236 (5th Cir.1984) (36 months); *In re King,* 23 B.R. 779 (9th Cir.BAP 1982) (up to three years); *In re Chavez,* 117 B.R. 730 (Bankr. S.D.Fla.1990) (36 months); *In re Anderson,* 73 B.R. 993 (Bankr.W.D.Okla.1987) (17 months); *In re Van Gordon,* 69 B.R. 545 (Bankr.D.Mont.1987) (three years); *In re Lapp,* 66 B.R. 67 (Bankr.D.Colo.1986) (24 months); *In re Schnupp,* 64 B.R. 763 (Bankr. N.D.Ill.1986) (31 months); *In re Hickson,* 52 B.R. 11 (Bankr.S.D.Fla.1985) (25 months); *In re Wiggins,* 21 B.R. 532 (Bankr.D.S.C. 1982) (25 months); *In re Smith,* 19 B.R. 592 (Bankr.N.D.Ga.1982) (14 months); *In re Beckman,* 9 B.R. 193 (Bankr.N.D.Ia.1981) (30 months). At least one of these courts has opined that fixing any sort of limit on the term of cure amounts to impermissible judicial legislation, as, apparently, would even the establishment of a general, non-binding guideline expressed with reference to any specific length of time. *In re Chavez,* 117 B.R. at 731. *See also In re Saylors,* 869 F.2d 1434, 1436 (11th Cir.1989); *In re Dockery,* 34 B.R. 95, 98 (Bankr.E.D.Mich.1983).

■ On its face, the statute indeed does not fix a specific time limit. Its incorporation of a "reasonableness" standard does, indeed, contemplate a case-specific inquiry of some depth, in which the central inquiry (as in all cases in which a "reasonableness" standard controls) is one of fact. *E.g., In re Taddeo,* 685 F.2d 24, 29 n. 6 (2d Cir.1982); *Grundy Nat'l Bank v. Stiltner,* 58 B.R. 593, 596 (W.D.Va.1986); *In re Coleman,* 5 B.R. 812, 813 (W.D.Ky.1980); *In re Hickson,* 52 B.R. at 13; *In re Lynch,* 12 B.R. 533, 535–

536 (Bankr.W.D.Wis.1981). However, decisions like the one in *Chavez* embody an unnecessarily inhibitive view of the decision-making authority that Congress clearly delegated to the Bankruptcy Court under § 1322(b)(5). Nothing in the nature of the legislative delegation bars a court from establishing a non-binding temporal guideline for the evaluation of debtors' cure proposals, which may be applied to *all* cases in which the statutory language is implicated.

■ Ultimately, such a guideline does not function as substantive law. Rather, it operates as something akin to a presumption or, more accurately, as a dividing line for the allocation of the burdens of proof on the fact issue in question. If the duration of a proposed cure period were to fall below the guideline, the objecting mortgagee would have the burden of producing evidence that the debtor's proposal placed it under an undue risk of recovery of its secured claim over the term of the debtor's performance. If it fell over that guideline, the burden of production would be on the debtor, to demonstrate a relative lack of such risk to the creditor's interests.[4] In the last instance, the burden of persuasion—the one applied when the evidence is in equipoise—should be on the debtor, as the party seeking the affirmative on the ultimate issue of fact. Imposing a rule like this is not a usurpation of legislative authority; it is no more than a responsible exercise of the power that any court has, to weigh the evidence before it in light of objective rules and principles. It certainly cannot be characterized as out of the contemplation of Congress when it framed the reasonableness standard; the legislative branch certainly intended to defer to the courts in the exercise of their traditional function.[5]

---

4. For examples of other judicial allocations of the burdens of proof in proceedings on confirmation of Chapter 13 plans, *see In re Ziegler,* 88 B.R. 67, 68–70 (Bankr.E.D.Pa.1988), and *In re Fries,* 68 B.R. 676, 683–685 (Bankr.E.D.Pa.1986).

5. The mere act of judicially establishing a guideline also serves the broad interests of both constituencies to this issue, to the extent that it will promote a more informed participation in the Chapter 13 process by both of them. Though the circumstances of individual debtors invoking § 1322(b)(5) may be as varied as one can imag-

ine, they and their attorneys should have the benefit of some judicial guidance to aid their evaluation of whether the § 1322(b)(5) remedy is even available in particular cases. On the other side, as counsel for Investors and Inland urges, the national home lending industry certainly has a justifiable claim to some degree of predictability in its treatment in these cases. The *guide* line, of course, cannot be a *bright* line. Congress could have established a statutory maximum, but chose not to. Though the courts can fix burdens of proof by enunciated guidelines, in the last instance they must evaluate the "reasonableness"

The court, then, has the power to craft and impose a guideline like the one voiced in *Whitebread.* The question becomes how to structure one: on what criteria should it be based? Unfortunately, the published opinion in *Whitebread* is opaque in this regard; it relies on a citation to an earlier, unpublished decision that is not generally available, and that may or may not have recited any more specific rationale for its presumption of a 12–month limit. As a rule of thumb, however, *Whitebread* has been applied by the judges of this Court with a fair degree of consistency. *See, e.g., In re Brady,* 86 B.R. 166, 170 at n. 5 (Bankr.D.Minn.1988) (noting that "in Minnesota it is unusual for plans to provide for cure of defaults [on home mortgage payments] in any period of time that significantly exceeds 12 months" . . .).

■ Contrary to the accusation made by Ms. Johnson's counsel, however, this approach has not been out of any unthinking adherence to the bare conclusion announced in *Whitebread;* it has been out of a recognition that Congress intended to strictly circumscribe the ability of Chapter 13 debtors to affect the contractual rights of their home lenders. *In re Brady,* 86 B.R. at 170. Under the statutory language cited *supra* at n. 2, the claims of homestead mortgagees are excepted from the general power that § 1322(b)92) grants to Chapter 13 debtors to "modify" secured claims—i.e., to alter their terms and conditions of payment, collateral entitlements, and other substantive rights under contract. In a broader fashion, the Supreme Court has acknowledged the legislative recognition of homestead mortgagees as a protected class in Chapter 13 cases. *Nobelman v. American Savings Bank,* —— U.S. ——, ——, 113 S.Ct. 2106, 2110, 124 L.Ed.2d 228 (1993) (Stevens, J., *concurring* ). *See also Grubbs v. Houston First American Savings Assoc.,* 730 F.2d at 245–246 (cited in *Nobelman,* and containing an extensive reconstruction of the legislative process that framed §§ 1322(b)(2) and 1322(b)(5)); *In re*

*Hussman,* 133 B.R. 490, 493 (Bankr.D.Minn. 1991). The determination to afford this protected status was, ultimately, a political decision that is not subject to judicial override. *In re Sauber,* 115 B.R. 197, 199 (Bankr. D.Minn.1990). Forming as much of a backdrop as it does, Congress's predisposition must be considered in passing on a debtor's invocation of the remedy under § 1322(b)(5).

These observations, nebulous as they may seem, have a very specific import for the question at bar. Any adjudication under a "reasonableness" standard requires consideration of the specific facts and circumstances surrounding the act or proposal that is to be gauged against it. The scope of the consideration, however, is not limited to the characteristics of the subject; it extends to the characteristics and interests of the adverse party that will be affected by the determination on reasonableness. To like effect, any judicial guideline that allocates the burden of proof on the issue of· "reasonableness" must be fashioned with reference to the general nature of the competing interests that are at stake, as well as their respective degrees of access to the evidence in question.

This means, then, that the peculiar interests of home lenders, as a constituent class of creditors deeply involved in most of the consumer bankruptcy cases before this Court, must be considered in fashioning a standard for the application of § 1322(b)(5). Since those interests implicate, to some degree, the soundness of the capital markets for home lending, *Nobelman v. American Savings Bank,* —— U.S. at ——, 113 S.Ct. at 2110, the members of that class have every right to demand a standard that reasonably defines and limits their exposure to additional financial risk once their borrowers go into Chapter 13.[6]

**B. What Guideline Should Be Applied.**

The question, then, becomes twofold:

1. What period should be fixed as a presumptive maximum time for cure, beyond

---

of particular cure proposals on a case-by-case basis.

**6.** They· can make use of such a guideline in at least two ways: to gauge their risks in entering mortgage loan transactions with prospective borrowers of more marginal creditworthiness; and to ascertain the likelihood of fully realizing on their investment if a defaulting borrower goes into Chapter 13, and to formulate their strategy for the case in accordance.

which the debtor must furnish some specific factual justification for his proposal?

2. If a debtor proposes to cure over a period longer than the presumptive maximum, what facts and circumstances on the part of the debtor and the mortgagee should be considered in passing on the reasonableness of that period?

■ Any treatment of the former issue must start with the recognition that

> [T]hose courts which allow cures in chapter 13 cases over lengthy periods of time, up to and including five years, do violence to [§ 1322(b)(5) ] and congressional intent. It was Congress' feeling that although a cure would be extended some period of time, that should not be [a] lengthy time so that the financial impact on secured creditors, although existent, is minimal.

*In re Brady,* 86 B.R. at 170, n. 5.

The soundness of this judgment, legislative and judicial, has been borne out by actual experience in this Court's Chapter 13 caseload since the enactment of the Bankruptcy Code of 1978. When prevailing interest rates rose precipitously in the early 1980s, the home lending industry loosened its traditional, more rigid standards for gauging the creditworthiness of applicants for home financing; it also relaxed its prior guidelines for incoming equity-to-value ratios for the underlying collateral. Together with such other developments as the evolution of the "secondary mortgage market" and the spread of private mortgage insurance, these changes had the result of making financing available to larger numbers of consumers than would otherwise have been the case under prevailing market conditions. However, this also meant that significantly larger numbers of home loans were made to individuals whose means were more modest, in relation to the amount of debt that they were taking on.

The higher levels of risk borne by the home lending industry have played their way out in the highest rates of borrower default since the Great Depression of 1929–1941. This development has had its impact on the federal court system: the numbers of Chapter 13 filings in this Court have nearly quadrupled over the decade since *Whitebread* was decided. There is no doubt that the greater incidence of individual financial distress evidenced by home mortgage default has been one of the main causes; this is simply but undeniably evidenced by the large number of Chapter 13 cases in which the debtor proposes to cure a pre-petition default on home mortgage payments pursuant to § 1322(b)(5). Two further, salient aspects of the Chapter 13 caseload evidence the fact that financial stress related to a particular choice of housing is often beyond remedy in bankruptcy: the bulk of this Court's docket for motions for relief from the automatic stay of 11 U.S.C. § 362(a) arises from failed Chapter 13 cases, and no more than 15 to 20 percent of Chapter 13 debtors in this Court follow through with their confirmed plans to the point of receiving discharge.

All of this underlines the advisability of continuing to apply the presumption that twelve months is the longest "reasonable" period over which a Chapter 13 debtor may be allowed to cure pre-petition arrearages. The reason is the basic nature of the subject matter: the stuff of the everyday lives of consumer debtors in our current national economy. Chapter 13 debtors may have much more financial stability post-petition than they had pre-petition, but only rarely will this be the case. More often, debtors' income situations are about equivalent before and after their Chapter 13 filings.[7] Where such debtors' pre-petition income was not sufficient to maintain currency on their mortgage debt, the means through which they can fund a cure and maintain post-petition mortgage payments are usually limited in number: they must have markedly more income post-petition, or must enforce stringent economies in other parts of their household budgets, or both.

The duration of any cure period is, of course, the end product of a ratio between the amount of the post-petition periodic payment that the debtor would apply to the cure, as denominator, and the total amount of the

7. At most, they may be somewhat better as a result of the end of a work layoff or period of unemployment, or the taking of additional part-time employment by a household member.

arrearages in question, as numerator. The components are the indicants of the debtor's past failure to control personal finances, and the debtor's promise to regain that control while in Chapter 13. The numerator identifies the degree of past financial prejudice that the mortgagee has suffered, resulting from the debtor's pre-petition default. Where the numerator is fixed at a large figure,[8] the denominator will entirely control the length of the cure period. The denominator and the product reflect, by and large, the amount of risk that the mortgagee will have to bear if the debtor's cure proposal is approved. The degree of risk is further clarified by identifying the changes, if any, between the debtor's pre- and post-petition financial position, and gauging the defensibility and sustainability of the changes.

Since the financial circumstances of most Chapter 13 debtors are roughly comparable, one can make several defensible observations as to the general run of their cases. If a debtor's home mortgage payment was and is large, as compared to available household income, default was and is more likely. If it was large, so measured, and the debtor lacked a financial "cushion" (savings, access to additional household income or employment, etc.), any personal financial setback, such as illness, unemployment, or divorce, may well result in default. If that upset is protracted, the default will be protracted and the accrued arrearages large; other periodic financial obligations will go into default; and the root source of the financial upset may persist, in whole or in part, for a long time. All of these factors, springing as they do from a common source, will have a synergistic effect on one another. This is a simple fact of personal finances.

The clear implication is that the realistic prospects of a full cure through Chapter 13 are probably reduced, in something like an exponential fashion, in proportion to the size of the arrearages and the amount of the debtor's post-petition disposable income: the larger the arrearage, and the smaller the proposed periodic payment in cure, the much more likely it is that the debtor will just not be able to sustain a long-term effort to make the mortgagee whole for the default. Further, over the period of a cure that is ultimately unsuccessful, the greater will be the risk that the mortgagee will not recover the economic value of its full investment.[9]

When all of these considerations are worked into a timeline, a presumptive limit of twelve months best balances economic realities, pre-petition contractual expectations, and the fresh-start policy of the Code. If a debtor cannot split out enough disposable income post-petition to pay down a mortgage arrearage within a year, it means either that the arrearage is very large and/or long-term, or that the debtor's post-petition means are straitened and/or tenuous. In either instance, the mortgagee is entitled to demand something more by way of assurance, than the debtor's mere promise to apply a modest amount of post-petition income to bring the account current over an extended time.

■ Admittedly—and as it has in individual cases in the past—this means that a heavy burden of proof falls on debtors who are in default for extended periods of time, or whose defaults total large sums; it may well mean that, in the majority of such cases, mortgage reinstatement under § 1322(b)(5) will be barred. Congress, however, expressly concluded that it is inappropriate to greatly upset the specified configurations of risks that mortgage lenders undertake in their original bargains with their borrowers. Allowing greatly-extended cure periods under the guise of § 1322(b)(5) erodes that legislative protection, by extending the lender's already-enhanced risk beyond the modest reallocation that is occasioned by the cure of a

---

8. This would be due to a large monthly mortgage payment *or* to a protracted pre-petition default.

9. This risk may be increased through the operation of several different forces. Market conditions may erode collateral value externally during the period of the delay. Value also may be eroded internally, if it is left in the hands of a party who lacks the financial wherewithal, and/or the personal motivation, to maintain the collateral's worth: physical wear and tear may remain unremedied, unpaid real estate taxes may result in the attachment of liens to the property, and the forced placement of property and casualty insurance if the debtor does not maintain them may also burden the mortgagee.

limited default over a short period of time. Absent the mortgagee's consent, then, or absent special circumstances that will otherwise protect the ultimate value of the creditor's secured rights, extending the cure period much beyond one year is too likely to infringe on its protected status in a fashion inconsistent with §§ 1322(b)(2) and 1322(b)(5).

In short, the conclusion reached in *Whitebread* is as sound under today's economic conditions, and in light of the intervening development of bankruptcy law, as it was when it was announced.

### C. Factors for Consideration After Guideline is Applied, and Burden is Shifted to Debtor.

■ The question then is how the debtor proposing to cure over a period of more than twelve months meets the burden of proof that is shifted onto him or her. In this regard, some of the factors considered by the courts that apply a presumption-free, "truly" case-by-case analysis are relevant:

1. The debtor's past record of payment on the underlying obligation, over the long term. *In re King,* 7 B.R. 110, 112 (Bankr.S.D.Cal.1980), *aff'd,* 23 B.R. 779 (9th Cir.BAP 1982). This general factor should be broken down into subfactors:

   a. The extent to which the debtor has paid down the original principal balance of the debt. *Id.*

   b. The amount and frequency of defaults before the one involved in the plan before the court.

   c. The amount of the current default, and time over which it was accrued. *In re Pollasky,* 7 B.R. 770, 771 (Bankr. D.Colo.1980); *In re Wiggins,* 21 B.R. 532, 534 (Bankr.D.S.C.1982).

2. The reason why the current default was accrued, *In re Chavez,* 117 B.R. at 732, and *In re King,* 7 B.R. at 112–113.

3. If past defaults occurred and were cured, the reasons for those defaults. *Id.*

4. The purpose for which the debtor holds the property subject to the mortgage in question (in *In re King,* phrased as to whether the debtor actually occu-pied the property, or held it as non-homestead or investment property, 7 B.R. at 113), to the extent that it may bear on the debtor's motivation in effecting the promised cure.

5. Whether the cure proposal represents the debtor's "best effort," in terms of its share of the aggregate current payments that the debtor proposes to make under the plan. *In re King,* 7 B.R. at 113.

6. The amount of "discretionary" income available to the debtor to make the payments on account of the cure. *In re Pollasky,* 7 B.R. at 771; *In re Wiggins,* 21 B.R. at 534.

7. The debtor's ability to maintain post-petition payments to the mortgagee, as they mature. *In re Pollasky,* 7 B.R. at 771; *In re Wiggins,* 21 B.R. at 534.

Other factors come to mind, some of which may be encompassed in the more broadly-phrased tests previously cited, and some of which may be original to the present analysis:

8. If other mortgages or liens encumber the objection creditor's collateral, the relative priority of the objecting creditor's mortgage against the competing liens.

9. The existence or non-existence of an "equity cushion" in the property in the hands of the debtor, and the value thereof.

10. The relative long-term financial benefit to be derived by the debtor by retaining the homestead under the terms of the pre-petition mortgage, as compared to the housing cost that the debtor would incur were he or she to relinquish the homestead.

11. The existence of strong personal or sentimental ties to the property on the part of the debtor, or other non-pecuniary circumstances that suggest that the debtor will make maximum effort to meet the cure obligations.

12. The actual likelihood that the debtor will have the means to perform under the plan, gauged from the debtor's current employment or other source of income, the debtor's prospects for retain-

ing that employment or other source of income, and the other family and personal demands on the debtor's means.

13. If the debtor's cure proposal incorporates a regular partial "balloon" payment, or a provision to complete the cure by a lump-sum payment, whether the debtor will be likely to effect the cure by prompt sale, realization of funds from sources other than current income, or other such alternate means.

14. Whether the payment of interest on the amount of the pre-petition arrearages to be cured, in accordance with *Rake v. Wade*, —— U.S. ——, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), will require an extension beyond the 12–month period and, if so, by what amount of time.

No single one of these factors will be controlling. If enough of them are present to form an articulable basis for concluding that a creditor will not bear an excessive risk of renewed default over a longer cure period, the debtor's proposal can be approved, and the plan containing it confirmed.

## III. APPLICATION OF STANDARD TO FACTS AT BAR

In both of these cases, the debtors bear the full burden of proof, and must justify their extended cure periods. The circumstances of their cases are quite different.

### A. The Newtons' Case.

The Newtons propose to pay $200.00 per month to the Chapter 13 Trustee over the duration of their plan. From the funds accumulated over the first 18 months of the plan,

the Trustee would pay part of the pre-petition arrearage owing to Investors.[10] Since the Debtors' plan uses standardized and non-specific wording, it is not clear whether Investors would receive the full amount of the Trustee's distributions during that period, or whether it would share them with the holders of the second and third mortgages against their homestead: Household Finance Corporation ("HFC")[11] and Mid–America Bank ("Mid–America").[12]

Below the standardized language, the Newtons' plan provides, tersely: "All claims to be paid in full within 18 months from proceeds of sale of Debtors' homestead." As their counsel explains, the Newtons hope to sell their homestead within that time, for a price that will enable them to pay all three debts chargeable against it as well as all of their unsecured debts.

Investors takes great exception to this cure proposal. Its counsel correctly notes that, even if the total of the Newtons' cash payments to the Trustee over the 18 months were applied to Investors's arrearage claim alone, it would reduce the pre-petition arrearage by no more than 50 percent. As Investors sees it, the proposal to cure the balance by selling the property is based on "too remote" a contingency to satisfy § 1322(b)(5).

For their part, the Newtons note that Investors has not countered their assertion in their schedules that the homestead is worth $160,000.00. They then posit that there is an "equity cushion" of some magnitude in the property, above the value of *all* charges against the property, which, pending sale, is

---

**10.** As noted earlier, in its written objection to confirmation Investors stated that these arrearages were in the sum of $6,143.60, plus contractual late charges. In its filed proof of claim, it asserts that the total amount required for "reinstatement" is $7,529.56. The recapitulation on the face of the proof of claim asserts the components of this total as the January through June, 1993 payments (the $6,143.60 previously indicated); the total of the late charges attributable to that six months' worth of payments ($228.33); and two other components, noted on line-entries entitled "Foreclosure Fees" ($913.55); and "Accrued Late Charges" ($244.08), without further explanation. It is unclear whether the last line-entry duplicates the earlier notation for contractual late charges or not.

**11.** In their schedules, the Newtons allege that they were in arrears in a total of 350.00 on their obligations to HFC. HFC's proof of claim alleges the arrearages total $1,200.00.

**12.** The Newtons schedule Mid–America's security as a third-priority mortgage against their homestead and a security interest in a 1986 Chevrolet Celebrity automobile. Mid–America's proof of claim alleges the arrearages total $1,050.00. On its face, Mid–America's proof of claim does not assert that the Newtons owed any pre-petition arrearages to it.

sufficient to afford Investors and the other two mortgagees "adequate protection" of their secured interests within the contemplation of 11 U.S.C. § 361.[13]

█ Several courts have treated the question of whether a proposal to cure homestead mortgage arrearages in whole or in part out of the proceeds of a post-petition sale (or a receipt of a lump sum of cash from other sources) passes muster under §§ 1322(b)(2) and 1322(b)(5). Clearly, the Code does not prohibit this type of proposal *per se;* 11 U.S.C. § 1322(b)(8), which allows a plan to "provide for the payment of all or part of a claim ... from property of the estate or property of the debtor," explicitly contemplates sale proceeds as a source of payment. *In re Ratmansky,* 7 B.R. 829, 832 (Bankr.E.D.Pa.1980). However, confirmation must be denied where the debtor proposes to cure solely from proceeds of sale when, as, and if it is closed, without proposing to maintain all post-petition mortgage payments as they mature in the ordinary course, or to apply a distribution from the Chapter 13 estate toward cure. *In re Proudfoot,* 144 B.R. 876, 878 (9th Cir.BAP 1992). It must also be denied where the debtor proposes to turn the proceeds of a post-petition sale over to the mortgagee but would defer the intervening obligation to make post-petition regular payments for a period of time. *In re Gavia,* 24 B.R. 573, 574 (9th Cir.BAP 1982) (rejecting proposed deferment of six months). These decisions are well-founded under the statute; obviously, any proposal to toll a debtor's obligation of periodic debt service works a modification of the mortgagee's contractual rights in violation of § 1322(b)(2), whether the tolling is indefinite or for a fixed term. More problematic are proposals such as the one at bar, where a cure would be effected by joint means, one defined by periodic cash payments but only partly efficacious, and the other contingent on a future market transaction.

Some courts have concluded that any proposal to pay a secured creditor from the proceeds of a future sale is so fraught with uncertainty as to fail confirmation requirements. *In re Nantz,* 75 B.R. 617, 619 (Bankr.E.D.Mo.1987) (applying "regular income" eligibility requirement of 11 U.S.C. § 109(e)); *In re Gavia,* 24 B.R. 216, 218 (Bankr.E.D.Calif.1982), *aff'd,* 24 B.R. 573 (9th Cir.BAP 1982) (applying feasibility requirement of 11 U.S.C. § 1325(a)(6)). *Cf. In re Ziegler,* 88 B.R. at 67; *In re Reines,* 30 B.R. 555 (Bankr.D.N.J.1983); and *In re Anderson,* 21 B.R. 443 (Bankr.N.D.Ga.1981) (all denying confirmation where debtors proposed to fund plans from proceeds they hoped to realize from pending lawsuits).

Others, properly deferring to the presence of § 1322(b)(8), have not ruled out confirmation of such plans as a matter of law. They have, however, held debtors to fairly exacting standards to ensure the likelihood of a realization for the secured party. These decisions almost universally contemplate the immediate marketing of the subject asset (usually a homestead). *In re Hogue,* 78 B.R. 867, 873 n. 9 (Bankr.S.D.Ohio 1987). Some suggest that there should be trustee or other administrative oversight of the marketing and sale process. *E.g., In re Anderson,* 28 B.R. 628, 629–630 (S.D.Ohio 1982). The approach embodied in this group of decisions is preferable to the outright denial of the remedy in *Nantz* and in the Bankruptcy Court decision in *Gavia.*

█ For a proposed cure-by-sale to pass muster, the debtor must make certain objective commitments in the plan, and meet any objection to confirmation by shouldering the burden of production of evidence at a hearing. The plan should specify the terms under which the debtor proposes to market the property, including the listing price and the length and commencement date of the listing agreement. It also should incorporate a default remedy to relieve the affected mortgagee(s) from the automatic stay, if the sale does not close by the end of the pro-

---

**13.** In oral argument, the Newtons' counsel maintained that there was "more than $22,000.00 in equity." As it stands, the total of the debt asserted on the face of the three mortgagees' proofs of claim is $146,579.27. Absent sustained objec-

tion, of course, these claims are deemed allowed in the amounts so asserted. 11 U.S.C. § 502(a). Even as such, however, the paper record would indicate that there is unencumbered value in the homestead of approximately $13,400.00.

posed cure period. If an affected mortgagee objects to confirmation, the debtor must produce evidence as to past marketing efforts, the state of the market for the subject asset, current sale prospects, the existence and maintenance of any "equity cushion" in the property, and all other circumstances that bear on whether the creditor will see its way out of the case financially whole. If the debtor cannot produce anything more than remote speculation as to the terms or date of a sale; if market conditions are eroding the value of the collateral; if the debtor's efforts at a sale are not directed or energetic enough; or if any other factors demonstrate that the creditor will not receive the value of its secured rights within a circumscribed, specified, and "reasonable" cure period, the court cannot confirm the plan. *E.g., In re Gavia,* 24 B.R. at 574; *In re Seem,* 92 B.R. 134, 135–136 (Bankr.E.D.Pa.1988); *In re Hogue,* 78 B.R. at 872–873; *In re Vieland,* 41 B.R. 134, 140–141 (Bankr.N.D.Ohio 1984); *In re Tucker,* 34 B.R. 257, 262–263 (Bankr. W.D.Okla.1983).

Its proposal for cure-by-sale as vague and terse as it is, the Newtons' plan raises all of the uncertainty proscribed by these decisions. Their abbreviated presentation for the confirmation hearing [14] did not prove up the likelihood of a prompt sale and cure. The existence of equity in the homestead, uncontroverted by Investors, is one point that lies in their favor. So, too, is their offer of a grant of relief from stay to Investors on an expedited, *ex parte* basis [15] if they do not

cure in full by the end of the 18–month period they propose, or if they default in any payment to the Trustee in the meantime. The latter provision, however, is not in the plan; if it is to be a key part of the Newtons' assurance to their mortgagee(s), it should be. Beyond this, the plan lacks any substantive requirements for their effort at marketing and sale, and there is no evidence of record going to it.

The Newtons, then, have not yet met their burden of demonstrating the reasonableness and feasibility of their cure proposal, whether as to the means for effectuating it or as to the duration within which it is to be effected. Because they hold some equity in the property, and would see that Investors receives a partial, interim cure in cash, the Newtons' proposal cannot be rejected out of hand. On the wording of the plan at bar and on the present record, however, the Court cannot give it the force of law by confirmation under § 1325.

### B. Ms. Johnson's Case.

■ Ms. Johnson proposes to pay the sum of $147.69 every two weeks to the Chapter 13 Trustee over the duration of her plan. On a monthly basis, this amounts to $320.00. She proposes to have this sum paid via withholding from her wages from Ramsey County. From the funds so accumulated, the Trustee would pay Inland an amount necessary to cure Ms. Johnson's pre-petition arrearages [16], via periodic payments.

---

**14.** The Newtons did not appear to testify, and their written response contains little factual detail.

**15.** Commonly, if somewhat inelegantly, termed "drop-dead relief from stay" in the parlance of local bankruptcy practitioners, this remedy amounts to a dispensation from the requirement under 11 U.S.C. § 362(d) and Loc.R.Bankr.P. (D.Minn.) 1201, 1202, 1210, and 1215, that a request under 11 U.S.C. § 362(d) be presented to the court at a hearing, upon full written motion, and after notice to the debtor(s), counsel, and other parties deemed entitled to such notice. The truncated procedure contemplates the entry of an order granting relief from stay upon the submission of an affidavit of default from the requesting party or its counsel. The affidavit is presented after the creditor has served a notice of default and the debtor has failed to cure within a time specified in the notice.

**16.** As noted earlier, in its objection to confirmation, Inland asserted these arrearages to be in the sum of $5,181.00, plus contractual late charges. In its filed proof of claim, it asserts that the arrearages total $6,321.56. In an attached recapitulation Inland identifies the components of this total as the November, 1992 through July, 1993 payments (the $5,181.00 previously indicated); eighth months' worth of late charges ($187.84); two other components, noted on line-entries entitled "Foreclosure fees and costs" ($300.00) and "Bankruptcy fees" ($100.00), without further explanation; and "Interest at 9.6 percent over repayment period" ($552.72). This proof of claim describes only Inland's claim for arrearages; it does not recite the outstanding principal balance of the indebtedness.

As Ms. Johnson's counsel acknowledges, his client's proposal would require at least 23 months to effect a cure, taking into consideration the reduction of Inland's in-hand realization by the Trustee's commission and, possibly, the deferral of payment to Inland by the prioritized payment of his own fees. Pointing to a number of different aspects of Ms. Johnson's situation and its past experience with her, Inland objects to this cure proposal.

Inland's objection is well-taken; Ms. Johnson has not met her burden to merit a cure period of the duration she proposes. As Inland maintains without objection, Ms. Johnson has no equity in the homestead. She schedules the property's value as $50,000.00. The record does not permit a precise finding as to the amount of the underlying debt, but it does support an inference that that amount equals or, more likely, slightly exceeds the scheduled value.[17] Ms. Johnson, then, has no interest in the house that has an economic value. The duration of her pre-petition default came close to equalling the full duration of her prior, timely performance under the loan. While she alleges, without controversy from Inland, that she has overcome the grave personal distress[18] that caused her default, she is left in a straitened situation, and without a financial "cushion": her net income is barely enough to cover the living expenses that she schedules in her frugal budget, and to make her proposed payment to the Chapter 13 estate. Under the budget, she cannot accumulate a reserve for unanticipated major automobile or home repairs, uncovered medical or dental expenses, education-related expenditures, and other financial burdens—the sort of exigencies that all too frequently hit consumer-debtors in Chapter 13. To meet such demands, she would have to divert funds otherwise committed to her current mortgage payment and her obligation to the Chapter 13 estate.[19] As it is, Ms. Johnson has barely enough to go around; were even a small economic pitfall to come before her, she just would not have enough.

If Ms. Johnson had an investment of real, current cash value in the homestead, one could fairly give her the benefit of the doubt, and forecast a strong motivation to keep the payments current even in the face of such exigencies. At the very least, in such an instance Inland would have the greater level of comfort to be derived from the prospect of actually recouping the cost of a second default from the value of the homestead after foreclosure. Under the circumstances, however, she does not, and it does not. Holding Inland at bay for the proposed cure period of nearly two years so greatly alters the prior allocation of risk between the parties that it would amount to a modification of Inland's pre-petition rights. The proposal does not provide for a cure within a reasonable time, and Ms. Johnson's plan cannot be confirmed.

## IV. ORDER

On the basis of the foregoing memorandum, then,

IT IS HEREBY ORDERED:

1. That confirmation of the Newtons' plan of debt adjustment, dated June 7, 1993, and filed on June 18, 1993, is denied.

2. That confirmation of Ms. Johnson's plan of debt adjustment, dated and filed on July 7, 1993, is denied.

3. That, if the debtors in these cases intend to proceed under Chapter 13 in this

---

17. The original mortgage instrument, attached as an exhibit to Inland's proof of claim, recites the principal balance of the original loan as $45,931.00. Ms. Johnson made timely monthly payments on the underlying debt for only one year. Given the interest rate (9.5 percent per year), and the 30–year term of the loan, the resultant amortization meant that no more than several hundred dollars' worth of the principal was paid down before Ms. Johnson went into default. Thus, even assuming the scheduled value of the house, Inland's claim for interest accrued during the nine-month term of default has attached to completely encumber any "paper equity" that Ms. Johnson held before her default.

18. She indicates that her marriage was dissolved in August, 1993, after a lengthy period of marital turmoil. During this time, her father died.

19. Ms. Johnson's counsel maintains that the use of wage withholding for her payment to the Trustee will prevent such an occurrence. As they are currently dispensed by this Court, however, orders for wage withholding may be vacated of right by debtors, on an *ex parte* basis.

Court, they shall file motions for pre-confirmation modification of their plans in these cases, after service on all creditors, counsel of record, and other parties entitled to notice, no later than *December 15, 1993*.