In re Lawrence E. SIDELINGER and Mary E. Sidelinger, Debtors.

FIRST NATIONAL BANK
OF DAMARISCOTTA,
Movant,

v.

Lawrence E. SIDELINGER and Mary E. Sidelinger, Respondents.

Bankruptcy No. 94–10140.

United States Bankruptcy Court, D. Maine.

Oct. 28, 1994.

Thomas R. Kelly, Brunswick, ME, for movant First Nat. Bank of Damariscotta.

Samuel M. Sherry, Cope & Cope, Portland, ME, for debtors/respondents Lawrence E. Sidelinger and Mary E. Sidelinger.

Peter Fessenden, Trustee.

### MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

First National Bank of Damariscotta ("First National"), holding a claim secured by a mortgage on the debtors' principal residence, has moved for relief from § 362's automatic stay.[1] Having considered the evidence, including the parties' post-hearing stipulations, for the reasons set forth below, First National's motion is granted, but only to the extent that continued operation of the automatic stay will be conditioned as set forth below.[2]

### Procedural History

Lawrence and Mary Sidelinger ("Sidelingers" or "debtors") filed bankruptcy under Chapter 7 on March 14, 1994. On April 26, 1994, they converted the case to Chapter 13.[3] The Sidelingers have amended their schedules and statements twice. They've amended their proposed Chapter 13 plan once.

First National filed its motion for relief from stay within weeks of the conversion. Following a timely,[4] telephonic preliminary hearing on the motion, the parties agreed that the stay would continue to operate pending a final hearing in mid-September 1994.

### The Mortgage Obligation

As of September 14, 1994, the Sidelingers owed First National $108,324.27. First Na-

tional's claim is secured only by a mortgage on the Sidelingers' residence. The home, valued at $125,000.00 is also encumbered by a $21,357.46 mortgage obligation to Farmers' Home Administration ("FmHA"). The debtors' monthly mortgage payment to First National is approximately $850.00.[5]

On the bankruptcy filing date, the Sidelingers' mortgage arrearage to First National was $4,671.00, exclusive of interest, penalties and fees. At conversion to Chapter 13 the arrearage totalled $5,524.90. On June 14, 1994, it was $7,223.42, the level at which it remained through the final hearing.

### Postpetition Performance

Between filing and the final hearing, the debtors paid First National three of the five monthly mortgage payments that came due. In addition, they made regular payments to the Chapter 13 trustee ($379.00 per month under the current plan version). The trustee's initial disbursement ($705.00) to First National on account of the mortgage arrearage issued on September 7, 1994.

### The Plan

The debtors predict they will soon amend their plan to provide increased payments (when Mary Sidelinger secures employment at one of several positions for which she's interviewed). Its present term is sixty months. It requires the Sidelingers to cure prepetition and postpetition mortgage arrearages (with interest) through the plan,[6] while making monthly mortgage payments as they come due "outside the plan." With plan payments as presently proposed, it will take

---

1. Unless otherwise noted, all references to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101 et seq.

2. On October 12, 1994, a written order on the motion for relief from stay issued, together with oral findings of fact and conclusions of law provided pursuant to Fed.R.Bankr.P. 7052 and 9014. This memorandum supplements those findings and conclusions.

3. See 11 U.S.C. § 706(a); Fed.R.Bankr.P. 1017(d).

4. See § 362(e).

5. The First National mortgage is a variable rate obligation extending beyond the projected term of the debtors' proposed plan.

6. The plan presently pegs arrearages at $5,520.00. The debtors tacitly acknowledge, however, that all postpetition arrearages will have to be funded through the plan unless they are somehow able to eliminate them before confirmation (an unlikely event). It is reasonable to conclude that a confirmed plan would have to provide for total cure payments of no less than $7,223.42.

approximately thirty-six months to cure mortgage arrearages.

## DISCUSSION

First National seeks relief from stay under § 362(d)(2).[7] The parties agree that the Sidelingers have no equity in the property. Thus the pivotal issue is whether the property is "necessary to an effective reorganization."

First National argues that the plan's legal deficiencies, as well as the debtors' inability to execute the plan, establish that successful reorganization is beyond the Sidelingers' grasp. Conceding that the debtors need their residence to go forward, the bank asserts that it cannot be "necessary to an effective reorganization" because an effective reorganization is not possible.

### 1. Burden of Proof.

■ Opposing relief from stay, the debtors bear the burden of demonstrating that their residence is "necessary to an effective reorganization." *See* § 362(g) (party seeking relief has burden of proof on the issue of a debtor's equity in the property; party opposing relief bears burden on "all other issues"). *See also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 814 F.2d 844, 847 (1st Cir.1987); *Marder v. Turner (In re Turner),* 161 B.R. 1, 3–4 (Bankr.D.Me.1993); *Davis v. Crescent Beach Inn, Inc. (In re Crescent Beach Inn, Inc.),* 22 B.R. 161, 163 n. 4 (Bankr.D.Me.1982); *Farina v. Ford Motor*

*Credit Company (In re Farina),* 9 B.R. 726, 730 (Bankr.D.Me.1981).

■ But the hurdle confronting the debtors at this stage is substantially lower than those they must clear at confirmation. To defeat First National's motion, the Sidelingers must prove by a preponderance of the evidence that there is " 'a reasonable possibility of a successful reorganization within a reasonable time.' " *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc. Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (Chapter 11) (citations omitted) (quoting *In re Timbers,* 808 F.2d 363, 370 (5th Cir.1987) (en banc)); *In re Sun Valley Newspapers, Inc.,* 171 B.R. 71, 74 (9th Cir. BAP 1994); *In re Turner,* 161 B.R. at 3 (Chapter 13).

### 2. How Long May Cure Endure?

Preserving the family residence is this Chapter 13 case's *raison d'etre.* First National contends that the debtors' plan's cure provision is legally impermissible because it proposes to cure over an unreasonably lengthy period of time.

■ Section 1322(b)(5) provides Chapter 13 debtors the opportunity to deaccelerate, cure and reinstate residential mortgages, notwithstanding § 1322(b)(2), which precludes "modifying" the rights of secured claimants holding only a security interest in real estate that is a debtor's principal residence.[8] *See Jim Walter Homes, Inc. v.*

---

7. Section 362(d) provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

The bank's motion might also be read as seeking relief for "cause" pursuant to § 362(d)(1), but it relies on no grounds independent of those discussed under the § 362(d)(2) analysis.

8. In its entirety, section 1322 provides:

**1322 Contents of plan.**

(a) The plan shall—

(1) provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan;

(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim; and

(3) if the plan classifies claims, provide the same treatment for each claim within a particular class.

(b) Subject to subsections (a) and (c) of this section, the plan may—

(1) designate a class or classes of unsecured claims, as provided in section 1122 of this

118

Spears (In re Thompson), 894 F.2d 1227, 1228 n. 4 (10th Cir.1990); In re Roach, 824 F.2d 1370, 1376–77 (3d Cir.1987); Foster Mortgage Corp. v. Terry (In re Terry), 780 F.2d 894, 896 (11th Cir.1985); Federal Land Bank v. Glenn (In re Glenn), 760 F.2d 1428, 1434–45 (6th Cir.), cert. denied, sub nom. Miller v. First Federal of Michigan, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985); In re Clark, 738 F.2d 869, 872 (7th Cir.1984); Grubbs v. Houston First American Savings Association, 730 F.2d 236, 241 (5th Cir.1984) (en banc); Di Pierro v. Taddeo (In re Taddeo), 685 F.2d 24, 27–28 (2d Cir.1982); Oregon, Department of Veterans' Affairs v. Braker (In re Braker), 125 B.R. 798, 800–01 (9th Cir. BAP 1991). Cf. In re Cormier, 147 B.R. 285, 293 (Bankr.D.Me.1992) (the Code's cure provisions provide Chapter 13 debtors a prescription for preserving property in circumstances where state law does not); In re Tucker, 131 B.R. 245, 246 (Bankr.D.Me.1991) (determination of whether a Chapter 13 debtor has a right to cure is a matter of federal bankruptcy law). See generally 1 Keith M. Lundin, Chapter 13 Bankruptcy §§ 4.37–4.44 and Vol. 2 at Appendix I (1993); 2 Epstein, Nickles & White, Bankruptcy § 9–17 (1992); 5 Lawrence King, Collier on Bankruptcy ¶ 1322.09 (15th ed. 1994) [hereinafter "Collier"]; Shawn A. Holcombe, Comment, The Power to Cure Default Under Chapter 12, 7

Bankr.Dev.J. 261, 262–278 (1990) (discussing Chapter 13); James S. Sable, A Chapter 13 Debtor's Right to Cure Default Under Section 1322(b): A Problem of Interpretation, 57 Bankr.L.J. 127, 134–136 (1983) (federal policy takes precedence over state law).

■ Chapter 13's cure enables debtors to reinstate credit relationships with those holding claims on which payments continue to accrue after the final plan payment is due, but requires the "curing of any default within a reasonable time" coupled with "maintenance of payments while the case is pending." § 1322(b)(5) (emphasis supplied). See Sapos v. Provident Institution of Savings, 967 F.2d 918, 926 (3d Cir.1992); Shearson Lehman Mortgage Corp. v. Laguna (In re Laguna), 944 F.2d 542, 544 (9th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 1577, 118 L.Ed.2d 219 (1992); Landmark Financial Services v. Hall, 918 F.2d 1150, 1153–54 (4th Cir.1990); In re Taddeo, 685 F.2d at 28; In re Lessman, 159 B.R. 135, 137 (Bankr. S.D.N.Y.1993).

Section 1322(b)(5)'s "reasonable time" is neither defined nor limited by the Code. The legislative history is unilluminating. See e.g., In re Herrera, No. 89–05207, 1991 WL 7704, at *1, 1991 Bankr. LEXIS 71, at *2–*3 (Bankr.D.P.R. Jan. 15, 1991); In re Hickson,

title, but may not discriminate unfairly against any class so designated; however, such plan may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims; (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; (3) provide for the curing or waiving of any default; (4) provide for payments on any unsecured claim to be made concurrently with payments on any secured claim or any other unsecured claim; (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;

(6) provide for the payment of all or any part of any claim allowed under section 1305 of this title; (7) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section; (8) provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor; (9) provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity; and (10) include any other appropriate provision not inconsistent with this title. (c) The plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years. "Security interest" means a "lien created by an agreement;" thus it comprehends consensual mortgages. § 101(51).

52 B.R. 11 (Bankr.S.D.Fla.1985); *In re King,* 7 B.R. 110, 112 (Bankr.S.D.Cal.1980), *aff'd,* 23 B.R. 779 (9th Cir. BAP 1982)).

■ Virtually all authorities agree that a bankruptcy court exercises its discretion in light of each case's unique facts to determine whether a given plan's cure terms are "reasonable" within § 1322(b)(5)'s meaning. *Grundy Nat. Bank v. Stiltner,* 58 B.R. 593, 596 (W.D.Va.1986); *In re Masterson,* 147 B.R. 295, 296 (Bankr.D.N.H.1992); *In re Herrera,* 1991 WL 7704 at *1, 1991 Bankr. LEXIS 71 at *3; *In re Chavez,* 117 B.R. 730, 731–32 (Bankr.S.D.Fla.1990); *Fleet Finance, Inc. v. Randolph (In re Randolph),* 102 B.R. 902, 903 (Bankr.S.D.Ga.1989). *See generally* 5 *Collier* ¶ 1322.09[5] at 27.

■ The "time" for cure extends forward from the bankruptcy filing. *In re Taddeo,* 685 F.2d at 29 (noting that pre-bankruptcy events may be considered in the court's reasonable time determination). But it most certainly may not extend beyond the plan's term. *Sapos,* 967 F.2d at 928.

■ Given the discretionary nature of the "reasonable time" determination and the myriad fact patterns Chapter 13 cases present, it is not surprising that a review of reported cases addressing the time within which cure must take place yields no rule of thumb. *Compare, e.g., In re Brooks,* 51 B.R. 741 (Bankr.S.D.Fla.1985) (nineteen months unreasonable); *In re Hailey,* 17 B.R. 167 (Bankr.S.D.Fla.1982) (twelve months unreasonable); and *GMAC v. Lawrence,* 11 B.R. 44, 45 (Bankr.N.D.Ga.1981); *with In re Cole,* 122 B.R. 943 (Bankr.E.D.Pa.1991) (sixty months reasonable); *In re Seem,* 92 B.R. 134 (Bankr.E.D.Pa.1988) (same); and *In re Harmon,* 72 B.R. 458 (Bankr.E.D.Pa.1987) (same). Cure term "reasonableness" does not present itself as a notion suited to application of *per se* rules. *See In re King,* 7 B.R. at 112–13 (rejecting notion that mortgage default cure term that equals or approximates plan term is *per se* unreasonable).

*In re Brooks* refused to confirm a plan proposing to cure mortgage arrearages over approximately nineteen months, terming the proposed cure period "unreasonable." 51 B.R. at 742–43.[9] Its holding was based in part on the court's conclusion that § 1322(b)(5)'s reasonable time for cure requirement is substantively equivalent to § 365(b)(1)(A)'s requirement that a debtor must "promptly cure" defaults when assuming an executory contract. *Id.* at 743. The court also commented: "While each case must be judged on its own facts, I have yet to see any case where it would be reasonable to permit a mortgagor without the lender's consent to take over a year to cure a default." *Id.*

Relying on *Brooks,* First National argues that the Sidelingers' cure proposal is unreasonable as a matter of law. But *Brooks* runs neither so clear nor so far as the bank would have it. Although the court's additional observations added volume to the flow, *Brooks'* course did not meander from mill run analysis: the court cautioned that "each case must be judged on its own facts." *Id. Brooks'* conclusion that § 365(b)(1)(A)'s "prompt cure" term should be read in *pari materia* with § 1322(b)(5)'s "reasonable time" provision wanders too far from the opinion's acknowledged "facts of the case" analysis and too far from the statutory language to be convincing. One need navigate the respective Code sections only a little way to conclude that, in using different terms, Congress buoyed divergent channels respecting executory contract assumptions and plan cure terms. A reasonable time for cure may, but need not be, a "prompt" cure. *See In re Masterson,* 147 B.R. at 297 and n. 2; *In re Lawrence,* 11 B.R. at 45.

Short of a *per se* rule, at least one court has adopted the premise that there should be a "presumptive" twelve month limitation on cure, subject to a debtor's showing that a longer period is reasonable under the circumstances. *In re Newton,* 161 B.R. 207, 211–12 (Bankr.D.Minn.1993). *Newton* utilized the presumptively reasonable cure period model to allocate burdens of production in confirmation determinations, but it, too, stands for the

---

**9.** Importantly, *Brooks* and other authorities relied upon by the parties are confirmation decisions, rather than relief from stay decisions. At that point, the court has the opportunity to consider fully all factors pertinent to confirmation. *See* § 1325.

proposition that determining a reasonable time for cure is a fact-driven exercise.[10]

Some courts have employed multi-factor formulae to gauge cure term reasonableness. *See, e.g., In re Newton,* 161 B.R. at 215–16 (fourteen factor test); *In re Lessman,* 159 B.R. at 138 (eight factor test); *In re Masterson,* 147 B.R. at 296–97 (analyzing reasonableness of cure term with reference to factors demonstrating "cause" for extending plan beyond thirty-six months); *In re Herrera,* 1991 WL 7704 at *1, 1991 Bankr. LEXIS 71 at *3 (five factor test).

Although a full and final evaluation of the Sidelingers' plans' reasonableness must await confirmation hearings, it is sufficient, for now, to note that the Sidelingers' mortgage obligation was in default for a matter of months before their bankruptcy filing. They have made substantial, if irregular, postpetition payments to the mortgagee. They have made substantial, regular payments to the trustee in accordance with their proposed Chapter 13 plan. The plan proposes cure within approximately thirty-six months. First National has already begun to receive distributions from the Chapter 13 trustee in respect of the mortgage arrears.

The debtors have demonstrated a reasonable likelihood of reorganization within a reasonable time. I cannot conclude to the contrary by dint of the plan's cure term's length alone.

### 3. How Sure is the Cure?

■ First National's second line of attack assumes that the debtors' plan might be permissible. Even so, it argues, the debtors lack financial wherewithal to execute its terms successfully. Again, however, the analysis must proceed under the "reasonable likelihood of reorganization" model.

Mr. Sidelinger works no fewer than six days a week in two lines of self-employment. He sells advertising on commission for a local newspaper. From the back of a van, he sells fish to wholesale and retail customers in western Massachusetts. The latter venture is a new one, but he has already tested the waters. He has substantial prior experience in the seafood business and although income from the two jobs is variable, it is reasonable to forecast that he will net enough to fund the plan.[11] Mrs. Sidelinger is presently unemployed. However, she is pursuing

---

**10.** The *Newton* court, after carefully considering "reasonableness" from the lender's point of view, concluded that a presumptive limitation on the time for cure is appropriate.

> If the duration of a proposed cure period were to fall below the guideline, the objecting mortgagee would have the burden of producing evidence that the debtor's proposal placed it under an undue risk of recovery of its secured claim over the term of the debtor's performance. If it fell over that guideline, the burden of production would be on the debtor to demonstrate a relative lack of such risk to the creditor's interests.... The **guide** line, of course, cannot be a **bright** line. Congress could have established a statutory maximum, but chose not to. Though the courts can fix burdens of proof by enunciated guidelines, in the last instance they must evaluate the "reasonableness" of particular proposals on a case-by-case basis.

*Newton,* 161 B.R. at 211 n. 5 (emphasis in original).

*Newton's* presumptive limitation approach does not undermine the Code-provided cure opportunity. It is, of course, a debtor's burden to prove all the elements required for confirmation (except, in some circumstances, "good faith"). *In re Colfer,* 159 B.R. 602, 608 (Bankr.D.Me. 1993). *See* § 1325(a)(3) and Fed.R.Bankr.P. 3015(f). *See Also* 2 Keith M. Lundin, *Chapter 13*

*Bankruptcy* § 5.11 (2d ed. 1994). The presumptive limitation doctrine *relieves* the debtor of producing evidence regarding cure term reasonableness unless that term exceeds twelve months. If it does, the debtor is expected to produce evidence to prove reasonableness of the term by a preponderance of evidence. *In re Newton,* 161 B.R. at 211–12. *See AMFAC Distribution Corp. v. Wolff (In re Wolff),* 22 B.R. 510, 512 (9th Cir. BAP 1982); *In re Lessman,* 159 B.R. at 137; *In re Colfer,* 159 B.R. at 608. *Cf. In re Hickson,* 52 B.R. at 13 (referring to practice "norm" requiring debtors proposing cure terms exceeding twelve months to demonstrate "unusual circumstances" or to obtain consent).

**11.** The bank attempts to demonstrate that Mr. Sidelinger's actual income since filing falls short of the income projections on which the plan is based. The argument is unconvincing. He is paid by the newspaper when ads are published, rather than when the space is sold, and receives only a modest draw against commissions until then. The debtors demonstrated that much of the space he has already sold has yet to be published and that he is presently selling ad space for Thanksgiving and Christmas. Thus, straight-line projections from early postpetition ad sales income do not fairly estimate Mr. Sidelinger's expected income.

employment that will provide additional income and benefits. Plan success does not depend on her immediate employment.[12]

The debtors have demonstrated a reasonable likelihood that their plan is sufficiently feasible to be confirmed.

### 4. An Ounce of Prevention.

■ All of this is not to say that the Sidelingers' prospects for Chapter 13 rehabilitation are assured. They concede that they have not made two of the five mortgage payments that fell due to First National after they initiated bankruptcy. Although such postpetition mortgage arrearages are not yet fatal to the debtors' efforts, *see, e.g., Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle),* 12 F.3d 1008, 1010 (11th Cir.1994) (§ 1322(b)(5) permits cure of postconfirmation defaults, let alone postpetition defaults); *In re Lessman,* 159 B.R. at 137; *In re Ford,* 84 B.R. 40, 44 (Bankr.E.D.Pa.1988); *In re Parker,* 46 B.R. 106, 108 (Bankr.N.D.Ga. 1985). *See Also* 5 *Collier* ¶ 1322.09[1] at 22, further arrearages would seriously threaten reorganization prospects.[13] *See* § 1322(b)(5) (cure entails "maintenance of payments while the case is pending"). *See also In re Lessman,* 159 B.R. at 137–38 (confirmation denied because, although § 1322(b)(5) permits curing postpetition, preconfirmation defaults, debtors were ten months in arrears on the mortgage when they commenced the case and made no postpetition mortgage payments); *In re Ford,* 84 B.R. at 44 (modest and justifiable post-petition delinquency can be cured; excessive delays in making current payments may run afoul of § 1322(b)(5)'s requirement that the debtor maintain payments, or become impermissibly onerous to the creditor). *Cf. In re Sensabaugh,* 88 B.R. 95, 96 (Bankr.E.D.Va.1988) (modification to cure seven postconfirmation defaults denied); *In re Parker,* 46 B.R. at 108 (cure rights do not vitiate the obligation to afford adequate protection).

In addition, notwithstanding passage of a considerable length of time, the debtors' plan has yet to be confirmed. Indeed, it may be amended further. Although the delays to date may be understandable, the debtors have had the benefit of a relatively lengthy "breathing space" and must immediately get about the business of confirming a plan.

Terminating the automatic stay is not in order, but the bankruptcy court may grant relief by imposing appropriate conditions upon its continued operation. § 362(d) (relief may include "terminating, annulling, modifying, or *conditioning* [the] stay") (emphasis supplied). *See Superior Paint Manufacturing Co., Inc. v. Lopez–Soto (In re Lopez–Soto),* 764 F.2d 23, 28 (1st Cir.1985) (bankruptcy court retains power to control the § 362(d) proceeding through ability to impose conditions upon those wish to maintain the stay); *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1307 and 1313 (5th Cir.1985); *Browning v. Navarro,* 743 F.2d 1069, 1074 and 1084 (5th Cir.1984) (court has authority and discretion to fashion relief according to the needs in a particular bankruptcy proceeding.); *Monopearl, Inc. v. Feldstein (In re Del Gizzo),* 5 B.R. 446, 448 (Bankr.D.R.I.1980). *See generally* 2 *Collier* ¶ 362.07.

To prevent additional mortgage arrearages from accruing, and in light of the time that has elapsed since filing, I will condition continued operation of the stay on the debtors' full performance of all obligations coming due hereafter under the First National mortgage note and agreement and, further, upon their prompt finalization and confirmation of a Chapter 13 plan.

### CONCLUSION

For the reasons set forth above, First National Bank of Damariscotta's motion for relief from stay is GRANTED to the extent that continued operation of the automatic

---

**12.** On the present record there is substantial likelihood that the plan can be funded with income from Mr. Sidelinger's advertising and fish sales. In any event, some additional, part-time employment is available to Mr. Sidelinger. He has represented that he will find time to take it if he must "to fund the plan and save the house."

**13.** The Sidelingers' current plan provides enough funding to cure all arrearages to date and to provide a meaningful dividend to the unsecured creditors.

stay is conditioned upon the debtors' performance of all obligations coming due under their mortgage note and agreement with First National Bank of Damariscotta and, further, if changes to the present plan are necessary, upon the debtors' filing their final proposed Chapter 13 plan within 10 days, and bringing a plan on for confirmation within 45 days of the date of this court's order.[14] Should they fail to meet these conditions in any respect, First National Bank of Damariscotta shall be granted relief from stay on five days' notice, without further hearing.

14. As noted above, the order in question issued on October 12, 1994.