**In re Albert HATCHER and Janice Hatcher, Debtors.**

**Bankruptcy No. 96–71607.**

United States Bankruptcy Court, E.D. Oklahoma.

Nov. 19, 1996.

---

Robert Inglish, Okmulgee, OK, for Debtors.

Lawrence A.G. Johnson, Tulsa, OK, for William J. Wade.

## OPINION

TOM R. CORNISH, Bankruptcy Judge.

On the 29th day of October, 1996, the Chapter 13 Plan; Objection by William J.

---

1. There is a seven cent discrepancy between the amount testified to at the evidentiary hearing and the breakdown of expenses submitted by Wade's

Wade; Objection to the Claim of William J. Wade and Response by William J. Wade came on for hearing. Counsel appearing were Robert Inglish for the Debtors and Lawrence A.G. Johnson for William J. Wade.

After hearing evidence presented, this Court does hereby enter the following findings and conclusions in conformity with Rule 7052, Fed.R.Bankr.P., in this core proceeding:

## FINDINGS OF FACT

The Debtors filed this bankruptcy in order to prevent foreclosure on their home. The Debtors purchased a home from Jim Walter Homes, Inc. ("JWH") on August 14, 1991. The purchase price of the home was $17,500. The Debtors financed $17,000 at ten percent (10%) interest. The total finance charges were $19,698.40 over eighteen (18) years. The Debtors executed a note and mortgage in favor of William Wade, Trustee for Mid–States Trust II ("Wade"), in the amount of $36,698.40, which is the amount financed plus the finance charges that were to incur.

In November 1995, the Debtors began experiencing financial difficulties and a foreclosure action was instituted against the Debtors. The Debtors contacted Wade's counsel and were informed that if they paid $5,316.33, their mortgage would be reinstated. Mrs. Hatcher's mother paid the arrearage in December 1995. Mr. Hatcher did not know if this brought the Debtors current through November or December. The money paid for the following items:

| | |
|---|---|
| Back payments | $1,359.10 |
| Taxes | 65.93 |
| Late charges | 152.64 |
| Insurance advanced | 700.46 |
| Court costs | 400.00 |
| Abstracting | 85.00 |
| Recording fee | 8.00 |
| Travel expense | 139.00 |
| Attorney fee reimbursement | 2,406.13 |
| | $5,316.26 [1] |

On May 15, 1996, Wade instituted a second foreclosure action in Leflore County. On July 10, 1996, a Journal Entry of Judgment was entered finding:

counsel after the hearing. This information was not furnished by Wade to the Debtors but was mailed to the Court from counsel for Wade.

that there is owing from the Defendants [Debtors] upon a note and mortgage sued upon herein the sum of $15,855.43 plus $4.34 per diem from 4/29/96, the amount prayed for in the Petition, together with an attorney fee of *$3,000.00,* being 15% of the "balance due" upon the note and mortgage. Fifteen percent of the balance due is only $2,378.31. The property was set for sheriff's sale on August 19, 1996 and on August 16, 1996, the Debtors filed this bankruptcy proceeding.

The Debtors sent four cashier's checks representing their payments in 1996 in the amount of $169.90 on January 25, 1996; February 9, 1996; May 1, 1996; and, May 9, 1996. Mr. Hatcher testified that they got behind on the March payment; however, two payments were made together in May.. At the time of foreclosure, Mr. Hatcher believed that he was only behind for his May payment. The payments made in May were returned to the Debtors by letter dated May 28, 1996 stating in order for the Debtors to reinstate their mortgage, they would need to pay back payments, late charges, taxes, insurance, court costs, title expenses and attorney fees.

The promissory note provides, in pertinent part:

It is further agreed that if it becomes necessary to enforce collection and upon referral to an attorney, not a salaried employee of the holder, I/we, or either of us agree to pay a reasonable attorney fee not to exceed 15 per cent of the unpaid debt and all costs of collection.

The Mortgage provides, in pertinent part:

7. The Seller requires the Buyer to keep the house sold under this contract insured against damage or loss from fire, lightning and extended coverage. Such coverage must begin not later than thirty (30) days from the date of this contract and continue until such time as Buyer's obligations under this contract are fully discharged.

*Buyer may choose the agency or company through which any required insurance is to be obtained,* so long as the agency or company is authorized to do business in Oklahoma. Buyer has the option of providing the required insurance through an existing policy or a policy independently obtained and paid for by the Buyer, or applying for insurance coverage through Best Insurers, Inc.

THE REQUIRED INSURANCE COVERAGE MUST INSURE THE HOUSE TO THE EXTENT OF THE LESSER OF THE ACTUAL CASH VALUE OF THE HOUSE OR THE UNPAID BALANCE OF THE CASH PRICE.

IF FIRE, LIGHTNING AND EXTENDED COVERAGE IN THE AMOUNT OF THE CASH PRICE OF THE HOUSE IS OBTAINED THROUGH BEST INSURERS, INC., THE INITIAL ANNUAL PREMIUM IS ESTIMATED AT *$246.00* FOR THE ONE–YEAR TERM OF THE POLICY. Seller is unable to advise Buyer of the premium if the required insurance is not obtained through Best Insurers, Inc.

The required policies shall contain a clause making the proceeds payable to the Seller, or its assigns, to the extent of the interest in the insured property. Seller reserves the right to refuse to accept an insurer offered by the Buyer if the policy is not in the form or amount acceptable to Seller.

In the event the Buyer fails to furnish an acceptable policy of insurance, premiums prepaid, or in the event Buyer fails to keep in effect the required insurance coverage, Seller shall have the right, but not the obligation, to purchase such coverage for the Buyer, and either add the premiums to the outstanding indebtedness or demand reimbursement from Buyer for those costs. Seller's right to purchase such insurance coverage shall continue until Buyer delivers or causes to be delivered to Seller or its assigns at P.O. Box 22610, Tampa, Florida 33622, or such other address as credit[or] or its assigns may request in writing, an insurance policy or policies providing the required insurance coverage together with satisfactory evidence of payment therefor, or until Buyer's indebtedness is fully discharged, whichever occurs first.

Buyer must make all insurance premium payments, whether for insurance purchased through Best Insurers, Inc., or from another company directly to the agency or company from which the insurance is obtained. *No premiums for insurance are included in this contract nor are any premiums paid for through Buyer's down payment or monthly payment.* INITIAL THE APPLICABLE BOX: \_\_\_\_ \_\_\_\_ The undersigned Buyer elects to obtain the insurance through Best Insurers, Inc.

*s/AJH s/JDH* The undersigned Buyer elects to furnish the required insurance through an insurance company other than Best Insurers, Inc.

(Emphasis in original). Mr. Hatcher believed that the insurance premiums were being added to his monthly payment. He has no objection to obtaining his own insurance on the property.

It is interesting to note that Jim Walter Homes has a policy in Oklahoma of not sending demand letters but filing suit first and then talking about making up arrearages. Mr. Johnson refers to this as an aggressive collection policy.

The Court notices in this case that the Hatchers were sent a letter by Mr. Johnson, after suit was filed, stating that the pay-off was $28,065.51. This statement was misleading in that the actual balance was $15,855.43. Mr. Johnson said if the Debtors would have called his office, they could have obtained the pay-off balance. The Court is not aware of any statutory procedure which puts this burden on the borrower.

### CONCLUSIONS OF LAW

Wade objects to the confirmation of the Chapter 13 plan because (1) it does not require that the Debtors maintain insurance on the property; (2) the plan does not provide for cure of default within 36 months; (3) the plan does not provide the contract rate of interest of the arrearage claim; and, (4) the plan does not provide for the correct amount of arrearage plus reasonable attorney fee. The Debtors have objected to Wade's Proof of Claim because the arrearage claim of $4,171.05 includes a $3,000.00 attorney fee as

a result of an uncontested foreclosure proceeding.

First, the Court will address the issue of insurance on the property. The plan is silent as to who is responsible for obtaining insurance on the property. There does not appear to be a dispute that insurance on the property is required. Mr. Hatcher believed that Wade would obtain insurance and the amount of the premiums would be added to his balance on the indebtedness. The Sales Contract provides that the seller requires that the buyer keep the house insured against damage or loss due to fire and lightning. The Sales Contract further provides that the buyer may choose the agency or company to insure the property as long as the agency or company is authorized to do business in Oklahoma. Also, the contract provides that if the Debtors do not provide insurance on the property, it will be obtained through Best Insurers, Inc., which is a subsidiary of Walter Industries. Walter Industries also owns JWH.

■ This Court believes that in order for a secured creditor to be adequately protected, insurance must be maintained on the property. It appears from the language of the Sales Contract that the Debtors are responsible for obtaining the insurance. Mr. Hatcher testified that he would obtain insurance on the premises if necessary. Thus, the Debtors shall obtain insurance and provide proof of insurance to the Court and Wade's counsel within fifteen (15) days of this Order.

■ Next, Wade argues that the default may not be cured over sixty (60) months. Section 1322(c) of the Bankruptcy Code provides:

(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—

(1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph ■ or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law.

Subsections (b)(3) and (b)(5) of Sec. 1322 provide:

(b) Subject to subsections (a) and (c) of this section, the plan may—

(3) provide for the curing or waiving of any default;

\* \* \* \* \* \*

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

Section 1322(c)(1) provides that the Debtors may cure the default pursuant to two different subsections; however, subsection (b)(5) is more specific than (b)(3). Specific statutes are controlling over general statutes. *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957). It appears from the statutes that if the last payment on the mortgage is due after the final payment under the plan is due, then subsection (b)(5) applies. In the instant case, the Debtors' last mortgage payment is due after the last plan payment. Thus, subsection (b)(5) applies and the issue becomes what is a "reasonable time" to cure mortgage default.

Section 1322(b)(5)'s "reasonable time" is neither defined nor limited by the Code. *First Nat'l Bank of Damariscotta v. Sidelinger (In re Sidelinger)*, 175 B.R. 115, 118 (Bankr.D.Me.1994). The legislative history does not provide any guidance. *Id.* Most authorities agree that the court exercises its discretion in light of each case's facts to determine whether a plan's terms to cure a default are reasonable within the meaning of § 1322(b)(5). *Id.* at 119 (citations omitted). The court in *Sidelinger* noted that:

Given the discretionary nature of the "reasonable time" determination and the myriad of the fact patterns Chapter 13 cases present, it is not surprising that a review of the reported cases addressing the time within which to cure must take place yields no rule of thumb.

*Id.* Some courts have allowed sixty months to cure arrearages. *Cole v. Cenlar Fed. Sav. Bank (In re Cole)*, 122 B.R. 943 (Bankr.

E.D.Pa.1991); *In re Seem*, 92 B.R. 134 (Bankr.E.D.Pa.1988); *In re Harmon*, 72 B.R. 458 (Bankr.E.D.Pa.1987); *But see In re Brooks*, 51 B.R. 741 (Bankr.S.D.Fla.1985); *In re Hailey*, 17 B.R. 167 (Bankr.S.D.Fla.1982); *GMAC v. Lawrence*, 11 B.R. 44, 45 (Bankr. N.D.Ga.1981).

Wade argues that *In re Penick*, 108 B.R. 776, 780 *(Bankr.W.D.Okla.1989) stands for the proposition that effectuating a cure of a mortgage default over more than thirty-six months is per se unreasonable. However, Judge Lindsey held:*

It is this court's view that such a lengthy period cannot be found to be reasonable in this case, where the plan contemplates no payment whatever against the arrearages for at least six months, when debtor's attorney and other administrative claimants will have been paid in full. If the debtors wish to take advantage of the substantial benefit which § 1322(b)(5) affords them, they must evidence their good faith by making every effort to cause the curing of the default to be accomplished in the shortest possible time, beginning, if at all possible, with the first plan payment.

*Id.*

The majority of case law requires that the "reasonable time" determination must be made on a case by case basis. The Debtors, in this case, are submitting their disposable income to the plan in a monthly payment of $311.62. Their monthly income and expenses are $2,010.00 and $1,694.90 respectively. Mrs. Hatcher has recently obtained employment. The Debtors attempted to make two payments for March and April. These cashier checks were received by JWH; however, they were returned to the Debtors during the foreclosure. The Debtors begin paying the arrearage in the first month of their plan. These payments would have made up $509.70 of the arrearage claim had JWH accepted the payments. The majority of the arrearage claim is for attorney fees and costs.

The Debtors begin paying the arrearage claim in the first month. The Debtors' home is necessary to their reorganization. Furthermore, the Debtors' attorney is being paid over the entire sixty (60) months. As a result, this Court finds that the payment of

the arrearage to Wade over sixty (60) months is not unreasonable.

■ Wade also argues that he is entitled to 10% interest on his claim. The Debtors' plan provides for 9% interest. The Tenth Circuit in *Hardzog v. Fed. Land Bank of Wichita (In re Hardzog)*, 901 F.2d 858, 860 (10th Cir.1990), held:

> Considering that most courts are utilizing a market rate approach and further considering that courts are well equipped to determine market rate, we hold in the absence of special circumstances, such as the market rate being higher than the contract rate, Bankruptcy Courts should use the current market rate of interest used for similar loans in the region. Bankruptcy Courts, counsel, lenders, and borrowers should have a familiarity with current interest rates on like-type loans and when a dispute arises, the market rate should be easily susceptible of determination by means of a hearing where each party is given the opportunity to submit evidence concerning the current market rate of interest for similar loans in the region. Chapter 12 is predicated upon the theory that the lender is making a new loan to the debtor. It therefore follows that the most appropriate interest rate is the current market rate for similar loans made in the region at the time the new loan is made. This approach should also tend to assure that both the lender and the debtor are treated fairly with neither receiving an advantage over the other.

In the instant case, the only evidence presented was on behalf of Wade. Luis Lopez, regional supervisor for JWH, testified that all sales in LeFlore County and in all of Oklahoma were made at 10% interest. He testified that even if the lawyers would apply for a loan through JWH, the interest rate would be 10%. This rate is nonnegotiable. The Court notes that the interest rate of a lending institution in LeFlore County would probably be less than 10%; however, no evidence was presented to the contrary. Thus, Wade's claim must provide for 10% interest.

■ Wade's last objection to the plan is that the plan does not provide for the correct amount of arrearages. The Debtors have objected to Wade's proof of claim. The parties are in dispute over the $3,000.00 attorney fee award for an uncontested foreclosure in LeFlore County. Wade was awarded $3,000.00 for an attorney fee; however, the contract only provides that Wade is entitled to 15% of the balance due on the note, which is $2,378.31.

■ The first inquiry is whether Wade is entitled to attorney fees. Section 506(b) has no application in an analysis of what charges the mortgagee can impose in making a claim for arrearages. *In re Nickleberry*, 76 B.R. 413, 420 (Bankr.E.D.Pa.1987). As a result, the analysis regarding a claim for arrearages must look to the parties' contract and the manner in which that contract would be construed under state law. *Id.*

Okla.Stat.Ann. tit. 14A, § 3–404 (West 1996) provides, in pertinent part:

> ... [W]ith respect to a consumer loan the agreement may provide for the payment by the debtor of reasonable attorney's fees not in excess of fifteen percent (15%) of the unpaid debt after default and referral to an attorney not a salaried employee of the lender.

Attorney fees for post-petition services are only justifiable if they are authorized by the Bankruptcy Code. *Id.* at 423. Section 506(b) of the Bankruptcy Code provides:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

In order for the creditor to be entitled to post-petition attorney fees, the creditor must be oversecured. *In re Defender Drug Stores, Inc.*, 126 B.R. 76, 80 (Bankr.D.Ariz. 1991), *aff'd* 145 B.R. 312 (9th Cir. BAP 1992); *In re Reposa*, 94 B.R. 257 (Bankr.D.R.I. 1988).

In the instant case, Wade is entitled to $2,378.31 in fees according to state law for pre-petition attorney fees. Wade is not ov-

ersecured. The Journal Entry of Judgment reflects that the balance owing is $15,855.43. In the Debtors' schedules, they have valued this property at $16,000.00. In the foreclosure action, the property was appraised at $15,000.00. No other evidence was presented on this issue. Thus, the Court finds that Wade is not oversecured and not entitled to post-petition attorney fees.

IT IS THEREFORE ORDERED that the Objection to Proof of Claim of William Wade, Trustee is **granted in part and denied in part.**

IT IS FURTHER ORDERED that confirmation of the Chapter 13 Plan is **denied.** The Debtors are to file an Amended Plan consistent with this opinion **within fifteen (15) days from the entry of this Order.**