**In re Margaret E. LINDSEY, Debtor.**

**Bankruptcy No. 93–03471.**

United States Bankruptcy Court,
D. Idaho.

May 12, 1995.

———

Kenneth L. Anderson, Lewiston, ID, for debtor.

Randall Peterman, Elam & Burke, Boise, ID, for West One.

Danny J. Radakovich, Lewiston, ID, per se.

Denise L. Rosen, Nez Perce County, Lewiston, ID, for Nez Perce County.

John Bury, Murphy, Bantz & Bury, Spokane, WA, for American West Realty.

L.C. Spurgeon, former trustee.

Barry Zimmerman, current trustee.

## MEMORANDUM OF DECISION

ALFRED C. HAGAN, Bankruptcy Judge.

Pending for decision are the following motions of West One Bank of Idaho: (1) motion to convert the case to a case under Chapter 7; and (2) motion for relief from the section 362 automatic stay.

### BACKGROUND

The bulk of debtor, Margaret Lindsey's, estate consists of a parcel of improved real property and several contiguous pieces of undeveloped property located in downtown Lewiston, Idaho. In addition the debtor is the sole shareholder of Nu–U Unlimited, Inc., a health club operating on the improved property (the "Nu–U–Spa"). In her schedules, the debtor values the Nu–U–Spa property at $475,000.00 and the attached lots at $300,000.00. In addition the debtor owns a $34,000.00 residence subject to a $8,100.00 mortgage. The value of the debtor's other assets is negligible.

1. The creditors holding secured claims against the commercial property are as follows:

| | |
|---|---|
| Bank: | $271,668.08 |
| Nez Perce County: | $ 50,961.21 |
| Frank Clark: | $ 45,000.00 |
| The Internal Revenue Service: | $ 14,397.43 |
| Western Construction and Logging | 1,565.28 |
| | $383,592.00 |

On the date the debtor's petition was filed, the Nu–U–Spa and the attached land were encumbered by over $390,000.00 in secured debt.[1] The principal secured creditors are West One Bank of Idaho (the "Bank"), Nez Perce County, Frank Clark, and the United States Internal Revenue Service. The debtor has approximately $78,000.00 in unsecured debt.

In 1985, the Bank made a loan to the debtor secured by the Nu–U–Spa real property and equipment. Since then the debtor has been unable to operate the Nu–U–Spa at a profit. The debtor's schedules list business income in the amount of $4,927.00 and expenses of $4,462.00 per month leaving a net business income of $535.00. per month. However the Nu–U Unlimited, Inc.'s tax returns show consistent losses over the last few years: 1993, loss of $8,076; 1992, loss of $9,232; 1991, loss of $9,843; 1990 gain of $760. The monthly reports submitted to the trustee show the business generated an average of $858.00 in income per month during 1994.[2] However, these figures do not include payment of the debts stayed by the bankruptcy proceeding.

The debtor has filed four separate bankruptcy proceedings involving the Nu–U–Spa. The debtor filed her first Chapter 11 proceeding in the bankruptcy court for the Eastern District of the State of Washington in 1988. *In re Margaret Lindsey, dba Nu–U Health Spa,* Case No. 88–01198–K–11 (Bankr.E.D.Wash.1988). Also in 1988, the debtor filed a chapter 13 proceeding in the Bankruptcy Court for the District of Idaho. *In re Margaret Lindsey,* 88–00488–BH (Bankr.Idaho 1988). No plan was ever confirmed. At the debtor's request, the 1988 District of Idaho proceeding was dismissed in December of 1989.

On May 18, 1990, the debtor filed a petition for relief under Chapter 11. *In re Margaret Lindsey,* 90–01631 H–11 (Bankr.D.Ida-

In addition, Caryl Jones holds a $8,100.00 claim secured by the debtor's residence. Thus, on the date the petition was filed the debtor owed $391,692.00 in secured debt.

2. The debtor also receives $378.00 a month in Social Security.

ho 1990). The debtor filed her first plan of reorganization on January 2, 1991. A Chapter 11 plan of reorganization was confirmed August 19, 1991. The case was closed on April 23, 1992, without completion of the Chapter 11 plan.

The debtor filed her voluntary petition for relief in the present Chapter 13 proceeding on December 10, 1993. She filed her first Chapter 13 plan on January 7, 1994. The plan provided for fifty-four payments of $125.00. In addition, the plan provided the trustee would sell the real property known as the Nu–U–Spa within 180 days. If the proceeds from the Nu–U–Spa were insufficient to pay 100% of all claims the trustee would have an additional 180 days to sell the remainder of the debtor's commercial unimproved real property.

Thus, the debtor proposed payment of less than $7,000.00 from her regular income and over $450,000.00 from the liquidation of her real property. The Bank objected to confirmation of the plan on the grounds the proceeds from the sale of the unimproved property should be distributed to lien holders of the unimproved property, i.e. the Bank. Confirmation was denied on April 5, 1994.

The debtor has since sold one of the unimproved parcels. With the exception of that one sale the debtor has made little effort for over a year toward the payment of her debts.

The debtor delayed almost one year before filing an amended Chapter 13 plan on February 3, 1995. The amended plan provides for 36 monthly payments of $125.00. Once again, 100% payment to the secured and unsecured creditors is to be made out of the sale of the debtor's property. However, the amended plan predicts one year for the sale of the real property. Otherwise the amended plan is essentially the same as her first plan.

The $125.00 per month payments proposed by the amended plan are insufficient to pay the interest and taxes accruing on the commercial properties. The schedules indicate the debtor does not have sufficient income to make larger monthly payments.

However, the debtor's income and expense schedules are not credible. Other than business expenses, the debtor lists only $400.00 per month in mortgage payments, $100.00 in utilities, $70.00 for food, $10.00 for medical expenses and $138.00 for health insurance. The inference is the debtor is using additional business income to meet her living expenses.

### DISCUSSION

Because the question of whether this proceeding should be dismissed depends in part on whether the debtor's plan is confirmable, the Bank's objections to confirmation of the debtor's plan will be considered.

### A. Confirmation of Plan

■ The Bank contends that the amended plan should not be confirmed because it is essentially a Chapter 13 liquidation. The Code does not explicitly prohibit funding of Chapter 13 plans through the liquidation of assets. Partially funding a Chapter 13 through the sale of property is permitted by Code section 1322(b)(8).[3] *In re Seem,* 92 B.R. 134, 136 (Bankr.E.D.Pa.1988) ("§ 1328(b)(8) allows payments from sale proceeds ..."); *In re Gavia,* 24 B.R. 573, 575 (9th Cir. BAP 1982) (§ 1322(b)(8) permits debtors to repay creditors out of property of the estate). Nevertheless,

> Chapter 13 is designed as a relief chapter for the adjustment of debts of an individual with regular income. While a Chapter 13 debtor may sell, use or lease property subject to the conditions outlined in Section 363, clearly it was never intended that a Chapter 13 plan would be funded by the sale of properties....

*In re Redditt,* 146 B.R. 693, 700 (Bankr. S.D.Miss.1992), *quoting, In re Tillery,* 124 B.R. 127, 128–129 (Bankr.M.D.Fla.1991).

■ Accordingly, Chapter 13 debtors may not fund a plan entirely from the sale of

---

**3.** 11 U.S.C. § 1322(b)(8) provides:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
> ....;

> (8) provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor;
> ....

11 U.S.C. § 1322(b)(8).

property. *In re Gavia*, 24 B.R. at 575. Nor may debtors use the sale of property to avoid the eligibility requirements of § 109(e). Therefore, debtors who have no disposable income with which to make payments under a Chapter 13 plan are not eligible for relief under Chapter 13 regardless of whether they can otherwise fund a plan through the sale of property. *In re Gavia*, 24 B.R. at 575. *See also In re Terry*, 630 F.2d 634 (8th Cir.1980) (a Chapter 13 debtor whose income does not exceed his expenses is not eligible under section 109(e)).

■ Nor can sale of the debtor's homestead or other property be used to circumnavigate the anti-modification requirements of sections 1322(b)(2) and (5). *In re Gavia*, 24 B.R. at 574–75; *Philadelphia Life Insurance Co. v. Proudfoot (In re Proudfoot)*, 144 B.R. 876, 878 (9th Cir. BAP 1992).

Even where a Chapter 13 plan does not violate § 1322(b) and is funded in part by payments from the debtors' income, courts have been particularly cautious when considering the good faith requirement and the feasibility of liquidation plans.[4] The court summarized these additional feasibility concerns in *In re Gavia*, 24 B.R. 216 (Bankr. E.D.Cal.1982), *aff'd*, 24 B.R. 573 (9th Cir. BAP 1982).

> What assurance do creditors get in exchange for the apparent detriment to them of receiving no payments incurring additional liability by the necessity of paying taxes and insurance for the hope that the property will be sold and payments made? At least in this instance there is none …
>
> [T]here is no certainty that any piece of real property can be sold in the foreseeable future with any degree of certainty in a specified period of time for a sum great enough to cover notes and deeds of trust upon the property, taxes, insurance and costs.

*In re Gavia*, 24 B.R. at 217–218.

Several courts have adopted a list of requirements a liquidation Chapter 13 plan

must contain before it will meet the good faith and feasibility requirements of § 1325.

For a proposed cure-by-sale to pass muster, the debtor must make certain objective commitments in the plan, and meet any objection to confirmation by shouldering the burden of production of evidence at a hearing. The plan should specify the terms under which the debtor proposes to market the property, including the listing price and the length and commencement date of the listing agreement. It also should incorporate a default remedy to relieve the affected mortgagee(s) from the automatic stay, if the sale does not close by the end of the proposed cure period. If an affected mortgagee objects to confirmation, the debtor must produce evidence as to past marketing efforts, the state of the market for the subject asset, current sale prospects, the existence and maintenance of any "equity cushion" in the property, and all other circumstances that bear on whether the creditor will see its way out of the case financially whole.

*In re Newton*, 161 B.R. at 217, 218.

Here, the debtor's amended plan does not modify the rights of any claim secured only by an interest in the debtor's principal residence. Therefore, the plan is not prohibited by § 1322(b)(2).

The fact the debtor has been making plan payments indicates the debtor has sufficient income to meet the requirements of section 109(e). However, the debtor proposes only token plan payments of $125.00 per month. These payments are insufficient to maintain the Bank's equity cushion and will require the Bank to insure the property and pay the taxes on it in order to maintain its current position. Thus although the plan technically meets the requirements of § 109(e) it is essentially a liquidation plan.

---

**4.** *See In re Gavia*, 24 B.R. at 574 (Chapter 13 plans which contemplated single payment to creditors from proceeds of sale of the debtors' residences not feasible); *In re Erickson*, 176 B.R. 753 (Bankr.E.D.Pa.1995) (holding Chapter 13 plan funded by sale of property was not feasible where the debtor had not stated the time period or terms of the sale and no provision was made for failure to sell the property); *In re Newton*, 161 B.R. 207, 217–218 (Bankr.D.Minn.1993) (requiring Chapter 13 plan to include marketing terms, listing price and default remedy); *In re Hogue*, 78 B.R. 867, 873 (Bankr.S.D.Ohio 1987) (Chapter 13 plan contemplating sale of residence three to five years after confirmation not feasible).

Nor has the debtor provided adequate assurances of feasibility and good faith. The property the debtor proposes to sell is distressed commercial property which the debtor has been unable to operate at a profit for over four years. The debtor has been attempting to sell the property for over one year since filing her petition. The plan does not specify the terms under which the debtor intends to market the property. Nor does the plan contain a default provision in the event the debtor fails to sell the property. In fact, although the plan provides sale is "anticipated" within one year, it does not actually require sale within one year.

At the confirmation hearing, the debtor's testimony concerning her efforts to market the property were vague and often unresponsive. The debtor's past track record suggests she will not sell the property in a timely manner.

Accordingly, the debtor's amended plan is not feasible.

Nor has the debtor met her burden of proof to show the plan was filed in good faith. "Bankruptcy courts must 'determine a debtor's good faith on a case-by-case basis, taking into account the particular features of each Chapter 13 plan.'" *Washington Student Loan Guaranty Association v. Porter (In re Porter)*, 102 B.R. 773, 775 (9th Cir BAP 1989), *quoting In re Goeb*, 675 F.2d 1386, 1390 (9th Cir.1982). In determining whether a particular plan is filed in good faith, "[t]he bankruptcy court must consider the totality of the circumstances, including prepetition conduct." *550 West Ina Road Trust v. Tucker (In re Tucker)*, 989 F.2d 328, 330 (9th Cir.1993).

In *In re Goeb*, the Ninth Circuit listed several factors which are indications of bad faith. These include: whether the debtor has misrepresented the facts in his plan; whether the plan is proposed in an inequitable manner; whether the debtor is attempting to unfairly manipulate the Bankruptcy Code; and whether the debtor acted in an equitable manner in proposing a plan. *In re Goeb*, 675 F.2d at 1390.

Other factors to be considered by the courts include:

1) The amount of the proposed payments and the amounts of the debtor's surplus;

2) The debtor's employment history, ability to earn, and likelihood of future increases in income;

3) The probable or expected duration of the plan;

4) The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;

5) The extent of preferential treatment between classes of creditors;

6) The extent to which secured claims are modified;

7) The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7;

8) The existence of special circumstances such as inordinate medical expenses;

9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

10) The motivation and sincerity of the debtor in seeking Chapter 13 relief; and

11) The burden which the plan's administration would place upon the trustee.

*Fidelity & Casualty of New York v. Warren (In re Warren)*, 89 B.R. 87, 93 (9th Cir. BAP 1988) *quoting, In re Brock*, 47 B.R. 167, 169 (Bankr.S.D.Cal.1985) (*quoting, In re Estus*, 695 F.2d 311, 317 (8th Cir.1982)).

The debtor has sought relief under the Code on numerous occasions. She has never sought relief under Chapter 7. Nevertheless she has, despite numerous filings only obtained a single confirmed plan. She defaulted on the payments due under that confirmed Chapter 11 plan. Nor has she made any real effort to service her unsecured debt. Thus, the debtor's previous filings are a strong indication of lack of good faith.

The amended plan proposed by the debtor would entail extra-ordinary administrative burdens on the trustee as compared to most Chapter 13 plans because the plan requires the trustee to oversee the sale of commercial real property.

The debtor's schedules are obviously inaccurate in that the living expenses proposed therein show the debtor is living on less than is truly possible, yet the debtor is making plan payments. Either the debtor's statement of income is understated or the debtor's business expenses are over stated or both. The debtor is living on this undisclosed income.

Meanwhile, the debtor is holding, and the amended plan would allow her to continue to hold, her commercial property rent free while interest and property taxes continue to accrue. This, in and of itself is an unfair manipulation of the Bankruptcy Code.

The numerous delays made by the debtor in filing her amended plan and proceeding with the sale of the property demonstrate the debtor's lack of sincerity in seeking Chapter 13 relief.

Accordingly, the Court concludes the debtor's plan is not proposed in good faith and therefore will not be confirmed.

At the confirmation hearing the debtor's attorney requested the opportunity to amend the plan should confirmation be denied. However, the Debtor has over $350,000.00 in secured debt and substantial unsecured debt. She has only $100.00 in surplus income per month. According to her schedules the debtor has very little disposable income. There is little or no chance the Debtor's income will increase and that the debtor could fund a plan with more than token payment from her current income. It is thus found no useful purpose would be served by authorizing another amendment, and that such would be prejudicial to creditors.

**B. Motion to Dismiss or Convert**

■ Bankruptcy Code section 1307(c) provides:

> (c) Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under the chapter to a case under Chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including—

> (1) unreasonable delay by the debtor that is prejudicial to creditors;

> ....;

> (3) failure to file a plan timely under section 1321 of this title;

> ....;

> (5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan ...

11 U.S.C. § 1307(c).

Here, confirmation of two of the debtor's plans has been denied. The debtor has requested and been denied additional time to file an amended plan.

■ A one year delay in filing an amended plan which is substantially the same as the first plan is unreasonable. Because the debtor's payments are insufficient to service the interest and property taxes accruing on her assets, the delay is prejudicial to her creditors.

Accordingly, there is ample cause to dismiss or convert this case. Additionally, the case should probably have been dismissed or converted for failure to meet the eligibility requirements of Code section 109(e). Code § 109(e) provides in relevant part:

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debt of less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000, ...

11 U.S.C. § 109(e) (West Supp.1994).

On the date the petition was filed the debtor owed over $390,000.00 in noncontingent unsecured debt.

It is in the best interests of the creditors to convert the case to Chapter 7 rather than dismiss it. There is substantial property in the estate which, if liquidated by a Chapter 7 trustee, would yield substantial proceeds for distribution to secured and unsecured creditors. Further, the funds received from the previous sale of property should inure to the benefit of creditors.

The debtor has requested the Court allow her the opportunity to convert to Chapter 11 before converting the case to Chapter 7. However, this proceeding has already been delayed over one year. Conversion to Chapter 11 would allow the debtor additional opportunities for delay. Further, under essentially the same conditions, the debtor has already failed to complete a Chapter 11 plan of reorganization. Accordingly, the debtor's request for time to move to convert to Chapter 11 will be denied.

## C. Relief From the Automatic Stay

■ The Bank contends it is entitled to relief from the automatic stay because: (1) the debtor defaulted under her Chapter 11 plan in a previous bankruptcy proceeding; and (2) also in the previous Chapter 11 proceeding, the debtor entered into a stipulated order allowing the Bank relief from the automatic stay in the Chapter 11 proceeding or any subsequent bankruptcy proceeding in the event of a default under the plan.

However, the cases cited by the Bank with regard to post confirmation default pertain to relief from the automatic stay imposed by the proceeding in which the plan is confirmed. *See In re Ellis,* 60 B.R. 432 (9th Cir. BAP 1985); *In re Moseley,* 74 B.R. 791 (Bankr.C.D.Cal.1987), *order vacated and appeal dismissed,* 101 B.R. 608 (9th Cir. BAP 1989); and *Reinbold v. Dewey County Bank,* 942 F.2d 1304 (8th Cir.1991), *cert. denied,* 503 U.S. 946, 112 S.Ct. 1499, 117 L.Ed.2d 639 (1992). No authority has been presented to indicate default under a plan in a previous bankruptcy proceeding is grounds for relief from stay in a subsequent bankruptcy proceeding.

■ Stipulated orders are generally enforceable. *In re Borchardt,* 47 B.R. 879 (Bankr.D.Minn.1985). However, the Bank has delayed enforcement of the stipulation since April of 1992. Since April of 1992, the debtor has incurred additional debt including debt secured by the collateral the Bank wishes to foreclose. Accordingly we need not decide whether a stipulated order allowing relief from the automatic stay is enforceable in a subsequent bankruptcy proceeding.

The Bank's motion for relief from the automatic stay will be denied. The Bank may renew its motion under § 362(d), in the event the Chapter 7 liquidation does not proceed expeditiously enough to protect the Bank's interests.